INVESTMENT REGISTRY, Limited, v. CHICAGO & M. ELECTRIC R. CO. et al.

(District Court, N. D. Illinois, E. D. January 2, 1913.)

No. 29,281.

1. JUDICIAL SALES (§ 19*)—MISCONDUCT AFFECTING VALIDITY—AGREEMENTS TO PREVENT BIDDING—"GENERAL PUBLIC."

The general rule is that the public shall be free to bid for property offered at a judicial sale, and the law prohibits the making of any bargain or the doing of any thing which takes from the public this liberty of action; but the term "general public" as used in this connection does not include persons who, by virtue of lien, or ownership, or otherwise, have an existing interest in the property to be sold. Such persons may combine together for the protection of their interests, and may even expressly agree not to bid against each other, in furtherance of a plan mutually agreed upon as calculated to conserve their rights, but in so doing their

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

activities must not operate to exclude any part of the general public as purchasers at the sale.

[Ed. Note.—For other cases, see Judicial Sales, Cent. Dig. §§ 41–43, 45, 46; Dec. Dig. § 19.*]

**2.** RAILROADS (§ 192*)—FORECLOSURE SALE—VALIDITY—COMBINATION IN RESTRAINT OF BIDDING.

A contract and agreement between prospective bidders for the property of an electric railroad company at foreclosure sale, by which bonds of the company, all of which had been bought up by the interests controlling a street railroad company, with the intention of buying the property and using the bonds in payment, were sold to another syndicate of bondholders, with the consent and assistance of a third group of bondholders, at a large advance over their cost to the sellers and above their market value, with an agreement that the sellers and their agents should, "to the extent of their power and influence, * * * in every reasonable way, aid and assist the purchasers in becoming the purchasers" of the property, *held* to constitute a combination in restraint of bidding which required the sale at which the property was bought for less than its fair value by the assignee with notice of the purchasing syndicate to be set aside on the objection of a nonassenting bondholder.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

**3.** RAILROADS (§ 192*)—FORECLOSURE SALE—VALIDITY—COMBINATION IN RESTRAINT OF BIDDING.

The sellers of the bonds in such case having had no interest in the property prior to the foreclosure suit, nor except as acquired for the express purpose of becoming bidders at the sale, the burden rested on the purchasers to show clearly that the sellers had altogether lost interest as intending purchasers of the property prior to the beginning of the negotiations resulting in their elimination.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

**4.** RAILROADS (§ 192*)—FORECLOSURE SALE—VALIDITY—COMBINATION IN RESTRAINT OF BIDDING—KNOWLEDGE AFFECTING PURCHASER.

The purchasing syndicate, subsequent to its purchase of the bonds, entered into a contract by which it transferred its interests to a reorganization committee, which later became the purchaser at the sale. By such contract the committee expressly assumed the obligations of the syndicate under its contract for purchase of the bonds including liability for a deferred payment thereon of over $800,000. *Held*, that the committee was charged with notice of and affected by the illegality of such contract.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 391, 634–642; Dec. Dig. § 192.*]

**5.** CORPORATIONS (§ 482*)—SALE OF PROPERTY UNDER MORTGAGE—CONFIRMATION—MATTERS CONSIDERED.

If it comes to the actual notice of the court on the hearing of a motion to confirm a foreclosure sale of the property of a public service corporation that the intending purchasers have conceived a definite program, through a reorganization plan, to use such property when acquired in a way, or to effect a purpose, forbidden by the Constitution or public policy of the state, the court may properly take such fact into consideration.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

In Equity. Suit by the Investment Registry, Limited, against the Chicago & Milwaukee Electric Railroad Company. On motion to confirm sale by special master and objections of Matilda W. Moses thereto. Objections sustained, sale set aside, and resale ordered.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Moses, Rosenthal & Kennedy, of Chicago, Ill. (Joseph W. Moses, of Chicago, Ill., of counsel), for objector.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for Smith and Ford and Reorganization Committee.

McCulloch & McCulloch, of Chicago, Ill., for Merchants' Loan & Trust Co.

Rosenthal & Hamill, of Chicago, Ill., for Western Trust & Savings Bank and Willoughby G. Walling.

LANDIS, District Judge. The matter before the court is an application to confirm the sale of the property of the Chicago & Milwaukee Electric Railroad Company. To the entry of this order objections have been filed by a bondholder. The reasons urged by the objector are that the price bid for the property is inadequate, and that the purchaser suppressed competition at the sale. Although a vast amount of contradictory testimony was heard on these issues and certain other matters conceived to have a bearing upon them, the court is of opinion that the real questions presented are rather free from difficulty.

There are two Chicago & Milwaukee Electric Railroad Companies organized under the laws of the states of Illinois and Wisconsin, respectively. Each company constructed an electric interurban railroad in the state of its organization. These two railroads were in reality one continuous line of track, extending from Evanston, Ill., to Milwaukee, Wis., with a branch in Illinois. In 1902, the Illinois company executed a mortgage covering all of its property to secure the payment of $5,000,000 of bonds, of which $4,000,000 were issued and are now outstanding. In 1905, the Wisconsin company executed a mortgage covering all of its property to secure the payment of an issue of $10,000,000 of bonds, all of which were issued and remain unpaid.

In January, 1908, proceedings by creditor's bill were started in the Circuit Court here and at Milwaukee, in the Eastern District of Wisconsin. In these proceedings receivers were appointed here and there. Subsequently bills were filed in the two jurisdictions to foreclose the mortgages mentioned, and these proceedings were consolidated with the original proceedings; the receivership having been continued to the present time. During the year 1912, decrees of sale were rendered here and at Milwaukee covering the property, respectively, of the two companies. The sales took place at Waukegan, Ill., and Racine, Wis., on September 25th, last. For the Illinois property $1,650,-000 was offered and for the Wisconsin property $1,600,000. These bids were made by agents representing a Reorganization Committee, with which committee there had been deposited approximately 95 per cent. of each issue of bonds under foreclosure. There being no other bids, the master has recommended their acceptance. The objection comes from a holder of 12 Illinois bonds which the owner refused to deposit under the proposed plan of reorganization, and, of course, attacks here only the Illinois sale.

To get an understanding of the questions presented by the objections, it is necessary to go back to the early days of the receivership.

In 1908, what was called the "Illinois Committee" was formed. Its declared purpose was the protection of the interests of holders of Illinois bonds. Other committees of Illinois bondholders were also formed for the assertion of the rights of their members. At about the same time there came into existence the Wisconsin committee for the protection of the interests of holders of Wisconsin bonds. With these various committees bonds of the respective issues were deposited. In addition to these committees, there was organized what was called the "Assisting Syndicate," which was an association of individuals, banks, and other financial institutions in Canada, where there were heavy holdings of Chicago & Milwaukee Electric stock and bonds. The securities in the hands of the Canadians were in the main the issue of the Wisconsin company, although to a slight extent they held obligations of the Illinois corporation. There was also in Holland what has been referred to in these proceedings as the "Dutch Syndicate," which held 1,647 of the Illinois bonds under foreclosure.

After the appointment of the receivers, and in 1908, the local street railway interests in the city of Milwaukee conceived the idea of acquiring the Illinois property. They already owned or controlled an electric road extending from Milwaukee south to Kenosha, and their purpose in seeking the Illinois division of the Chicago & Milwaukee Electric was in furtherance of their plan to acquire a through line from Milwaukee to Chicago. It was their program, if they got the Illinois division, to extend it north to a connection with their road at Kenosha, and to build south from Evanston, which extensions, with trackage rights into Chicago to be negotiated with one of the elevated companies, would accomplish their purpose. As a means to this end, these Milwaukee interests set out to acquire Illinois bonds. The purchases were made through attorneys George P. Miller and Francis Bloodgood, of Milwaukee, and William W. Gurley, of Chicago. They endeavored to acquire the Dutch holdings and sent a representative to Holland for that purpose, but their efforts in that direction were frustrated by the activities of the Canadian Assisting Syndicate, which organization obtained control of those bonds under an agreement with the Dutch, which agreement was followed, in March, 1911, by the purchase by the Canadians of the 1,647 Dutch bonds, at 65 cents on the dollar. Shortly after this purchase, the interest of the Milwaukee street railway people was bought by the Assisting Syndicate and finally, by an agreement entered into in January, 1912, the Reorganization Committee, which was the purchaser at the judicial sale under examination here, succeeded to the rights and liabilities of the Assisting Syndicate. It is these transactions between the Milwaukee street railway interests and the Assisting Syndicate, and between the Assisting Syndicate and the Reorganization Committee, taken in connection with what is claimed to be an inadequate bid for the property, upon which the objector bases the charge of suppression of competition.

The contract between the Milwaukee interests and the Assisting Syndicate was executed April 21, 1911, with the advice and approval of the committee of Wisconsin bondholders. By its terms the syn-

dicate acquired from the Milwaukee interests what those interests had purchased, namely, 530 bonds of an underlying issue of $1,080,000 and 401 bonds of the issue under foreclosure. For these bonds the syndicate agreed to pay $1,122,636.25; Of this amount $300,000 was to be paid not later than June 1, 1911. The remaining $822,636.25 was to be paid within 30 days after the sale of the Illinois property under the decree of this court. The agreement further contained the following provision:

"It is further agreed that the vendors (the Milwaukee interests) and their associates, including George P. Miller and Francis Bloodgood, shall, to the extent of their power and influence and information, in every reasonable way aid and assist the purchasers in becoming the purchasers of the Chicago & Milwaukee Electric Railroad property (both divisions), and in making effective their plan of reorganization thereof."

This contract, which was executed by Charles F. Pfister and John I. Beggs, as the Milwaukee interests, and H. S. Osler, an attorney of Toronto, Canada, for the Assisting Syndicate, contained other provisions, and there were other agreements entered into between the parties at about the same time; but the provisions pertinent here have been mentioned.

It is the position of the objector that this contract amounted to a buying off of an intending bidder. This is controverted by the Reorganization Committee, whose contention it is that what happened was merely a coming together of bondholders for harmonious co-operation, with a view to conserving their respective interests. Furthermore, they deny that the Reorganization Committee is chargeable, even though the transaction between the Milwaukee interests and the Assisting Syndicate is to be condemned.

[1] The general rule is that the public shall be free to bid for property offered at a judicial sale, and the law prohibits the making of any bargain or the doing of any thing which takes from any part of the public this liberty of action. The term "general public," however, as used in this connection, does not include "persons who, by virtue of lien or ownership or otherwise, have an existing interest in the property to be sold." Such persons may combine together for the protection of their interests. They may even expressly agree not to bid against each other, in furtherance of a plan mutually agreed upon as calculated to conserve their rights. But in so doing, their activities must not operate to exclude any part of the general public as purchasers at the sale.

[2] Therefore the first question here is whether or not the agreements mentioned amounted, in fact, only to a combination between bondholders for the mere protection of their interests, as such, or whether those agreements kept away from the sale persons who, while they did have an existing interest in the property as holders of bonds, were in reality so circumstanced that they must be classed with the general public.

[3] Prior to the collapse of the Chicago & Milwaukee Electric enterprise, the Milwaukee street railway people had no investment in this property. They did not hold a dollar's worth of bonds or stock. Their purchases began only after the receivers were appointed. And

their sole purpose in buying the bonds was to use them as an instrumentality in acquiring the property; that is to say, to turn them in as part satisfaction of a bid to be made by them at the judicial sale. Their relation to the property was therefore that of a prospective bidder. This attitude made it hazardous for other persons seeking the property to bargain with the Milwaukee interests for their elimination. In such case there is a burden on the beneficiaries to show clearly that the parties selling out had altogether lost interest as intending purchasers of the property *prior to the beginning of the negotiations resulting in their elimination.*

And so in this proceeding it was sought to be established that the Milwaukee people had abandoned their original purpose; the contention being that they lost interest and changed their attitude when the Assisting Syndicate got in ahead of them and bought the Dutch bonds, which took place March 10, 1911. But this claim is not justified by the evidence. George P. Miller, of counsel for the Milwaukee people, testified that the negotiations by his clients for an entrance into Chicago over the elevated road continued uninterruptedly after the Assisting Syndicate bought the Dutch bonds, and indeed (as he expressed it) "were not abandoned until we sold out," which was on April 21, 1911. As exhibiting the real attitude of the Milwaukee people at the time of the sale, the following is quoted from the witness Miller's testimony:

"We had a large interest in this line, having acquired those bonds. Now, the Assisting Syndicate had a large interest. We had to go ahead and protect our interest, and we tried to protect our interest by getting an entrance into Chicago, * * * and we offered to buy out the Assisting Syndicate, and said, 'We will pay you all your bonds cost and all your expense, and give you an attorney's fee—all the special expense.' And they refused that, and thereupon they agreed to do the same for us."

And so the contract of April 21st was made, by which the Assisting Syndicate bought out the Milwaukee interests, paying for their bonds over and above the cost to the Milwaukee interests, $300,000, as an item of expense, and taking from them, as has been shown, a covenant that they would use all reasonable means to aid the Assisting Syndicate in becoming the purchaser of the property at the sale. There has been considerable controversy as to why this covenant was inserted in the agreement and why the $300,000 exaction was acceded to by the Assisting Syndicate. All the lawyers that had to do with that transaction on either side testified that the purpose was most emphatically not to get rid of a possible competing bidder. And, although it figures out that the Canadians paid about 120 for bonds that were a drug on the market at 65, it never occurred to any of these gentlemen that the arrangement might even possibly have the effect of getting rid of a competing bidder. So at least they testified here as witnesses in this proceeding. Of course, there is a remote, very remote, possibility that this is true. But the court finds it to be the fact that, when the Canadians bargained to pay this money in excess of the bond value, it was to get something besides bonds, and the only other thing that was worth their while to pay the Milwaukee people this excess money for, was noninterference by the Milwaukee people

with the syndicate's reorganization plan. This they were not at liberty to do, as against the protest of a nondepositing, nonassenting holder of Illinois bonds.

[4] The question remains, on this branch of the subject: "Was the Reorganization Committee afflicted with the taint of this transaction?" The answer is found in certain documentary evidence. On the 1st of May, 1911, the committee of Wisconsin bondholders, which it will be' recalled had assented to the policy of the purchase of the interests of the Milwaukee people by the Assisting Syndicate ten days before, made an agreement with that syndicate by which it was declared to be the intention of the parties that the only liability which was to be assumed by the syndicate under its contract with the Milwaukee people was the purchase of the block of 401 Illinois bonds under foreclosure, and that the balance of the amount by that contract agreed to be paid the Milwaukee interests was to be paid by the reorganized company which, after foreclosure and sale of both the Illinois and Wisconsin properties, should purchase and own the railroad. And to secure the syndicate against its liability to pay the balance of $822,000 (as by its contract with the Milwaukee people the syndicate had agreed to do), the Wisconsin Committee pledged all the Wisconsin bonds that had been deposited with that committee. Following this, and on January 26, 1912, the Assisting Syndicate made a contract with the Reorganization Committee (which purchased the property on September 25th). And this contract expressly provided that the agreement between the Assisting Syndicate and the Wisconsin Committee, just referred to, should be assumed and discharged by the Reorganization Committee. In other words, the purchaser at the judicial sale undertook the payment of the balance of $822,000 due the Milwaukee people under their agreement with the Assisting Syndicate, which payment, as has been observed, had been agreed to be made to the Milwaukee interests as part consideration for their elimination. When the Reorganization Committee thus deliberately agreed to step into the shoes of its predecessor, it could not acquire and enjoy the rights and benefits, shorn of the liabilities.' The legal effect of its undertaking is just the same as if (instead of the transactions having occurred as narrated) the Milwaukee street railway people had gone to Waukegan on the day of the sale and appeared there in the attitude of a bidder, and had been induced to abandon that attitude by the promise of the Reorganization Committee, then and there made, to pay them the money which, in April, 1911, the Assisting Syndicate had agreed to pay.

[5] On the question of value of the property, the court heard evidence as to physical conditions, earnings (past, present, and prospective), franchise conditions, and other matters, fairly entitled to be considered under this head. It is my opinion, on the showing made, the Illinois property is reasonably worth approximately $4,500,000. The bid of the committee and the obligations which the purchaser must assume aggregate in the neighborhood of $2,800,000 as the cost of the Illinois property to the committee. The bids on both divisions, as has been seen, total $3,250,000. Add to this the amount of the

underlying bonds and all other expenses estimated by H. M. Byllesby & Co., on behalf of the Reorganization Committee, as necessary to be incurred in adjusting and discharging liens and rehabilitating the property, including extensions and betterments, and the total cost to the committee of the entire line in Illinois and Wisconsin, including a connection with the elevated road in Chicago, approximates $6,700,-000. Now, it is the declared purpose of the Reorganization Committee, if it gets this property, to turn it over to a new company which the Reorganization Committee proposes to organize. And it is the committee's plan that this new company shall then be authorized to issue securities as follows:

| | |
|---|---:|
| First mortgage bonds | $10,000,000 00 |
| Second mortgage bonds | 4,500,000 00 |
| Third mortgage bonds | 6,000,000 00 |
| Capital stock | 6,000,000 00 |
| Total | $26,500,000 00 |

Of this total of $26,500,000, it is the committee's purpose that the new company shall put out $21,000,000, to be used in putting through this reorganization. This appears from the Reorganization Committee's plan which they have distributed to bondholders and which bears the approval of Attorneys Newman, Northrup, Levinson and Becker, of Chicago, Attorneys Lash and Osler, of Toronto, Canada, and Attorney John P. Wilson, of Chicago. It is very plain, from these figures, that a great mass of these securities, if issued, will really represent no investment whatever by anybody at any time. And this is proposed to be done in the teeth of the Public Utility Law of Wisconsin and the Constitution of Illinois. Our fundamental law contains the following provision:

"No railroad corporation shall issue any stock or bonds except for money, labor, or property actually received and applied to the purposes for which such corporation was created."

Even if this prohibition in our Constitution should be held to apply only to steam railroads, the prohibition would still remain as the deliberately declared public policy of the state of Illinois, and as such entitled to respect and obedience. And while doubtless it is true that a court is under no obligation, of his own motion, as a volunteer, to go outside and institute an inquiry into the plans and purposes of persons offering themselves as purchasers of property at a judicial sale, I take it as being rather plain that if it comes to the actual notice of the court in a regular judicial proceeding that such intending purchasers have conceived a definite program to use such property, when acquired, in a way, or to effect a purpose, forbidden by the Constitution or public policy of the state, the court should at least pause and hesitate before turning the property over. In the present case this course will enable the members of the committee and their counsel to consider, before the property shall again be offered for sale, whether it would not be well to adopt a program authorized by law.

There will be another sale, at which time there will have to be a higher bid.