[No. 21664.  *En Banc.*  March 27, 1930.]

J. E. PINKHAM LUMBER COMPANY, *Respondent*, v. WOODLAND STATE BANK *et al., Appellants.*

J. E. PINKHAM LUMBER COMPANY, *Cross-Appellant, v.* GEORGE E. NOBLE, *Respondent.*[1]

118

*Fisk & McCarthy,* for appellants.

*Alexander & Bundy* and *O. A. Tucker,* for respondent.

FULLERTON, J.—Pursuant to a contract consummated on July 2, 1927, the Woodland State Bank sold to the J. E. Pinkham Lumber Company certain timber lands. In this action the lumber company seeks to rescind the sale and recover the purchase price paid for the lands on the ground that it was induced by fraud practiced upon it to pay an excessive price for the property. It made parties defendant to the action, in addition to the bank, E. E. Dale and George E. Noble. The trial court awarded to the lumber company the relief sought as against the bank and Dale, and dismissed the action as to Noble. The bank and Dale appeal generally from the judgment, and the timber company cross-appeals from the order of court dismissing the action as to Noble.

The cause was tried by the court below sitting without a jury as an action of equitable cognizance, and is before us as to its facts on the findings made by the court, the evidence not having been brought up with the record. From the findings it appears that the lumber company named is engaged in the business of dealing in timber products, a part of such products being shakes split from cedar timber. The defendant Noble was engaged in the business of manufacturing such shakes, and the lumber company obtained its principal supply from him. Noble did not own any considerable

body of timber from which the shakes could be manufactured, and was without means to procure the timber needed for his purposes except in limited quantities and from time to time, and because of these conditions could not always supply the requirements of the timber company. He thereupon represented to the timber company that it would be to their mutual interests to procure a body of timber suitable for their purposes, and solicited the company to purchase such a body.

The company, influenced by and acting upon these representations, authorized Noble to investigate available tracts of timber and report to it any which he deemed it advisable to purchase. Noble, in his search for available tracts, found a tract of land owned by the Woodland State Bank, and learned on inquiry at the bank that the tract was for sale and could be purchased at a price of $6,500. Noble reported his findings to the lumber company and requested it to furnish the means to purchase the tract. The company authorized Noble to investigate the timber on the land, and arrange for a cruise thereof, stating to him that, if he was satisfied as to the quantity and quality of the timber, it would consider its purchase. The findings then proceed:

"That thereafter the defendants Noble and Woodland State Bank arranged for a joint cruise of said timber, and the bank employed the defendant Dale to go to said timber with a cruiser and there to meet the defendant Noble and a cruiser employed by him, for the purpose of making such joint cruise, and that on or about the 19th day of June, 1927, the defendants Noble and Dale met at said timber for such purpose; that at said time the defendants Dale and Noble entered into a secret plan to cause the plaintiff to purchase said timber land at a price in excess of the price at which the bank was willing to sell, and whereby they would divide the amount to be paid by the plaintiff in excess of the bank's price.

"That thereafter and pursuant to said secret plan, defendant Noble falsely stated to the plaintiff that the control of said timber land had passed to the defendant Dale and that Dale was demanding a price of $2.50 per thousand feet stumpage, which price on the basis of said joint cruise would have been in excess of $10,-000, and that the defendant Noble further stated that the property was worth such increased price and urged the plaintiff to purchase the same.

"That in further pursuance of said plan, the defendant Dale procured from the defendant bank authority to negotiate with the plaintiff for said timber land with the understanding that Dale should receive all he could induce the plaintiff to pay in excess of the bank's price of $6,500.

"That thereafter and on or about the 28th day of June, 1927, the plaintiff's said manager and defendant Noble met the defendant Dale at Woodland to negotiate for the purchase of said property; that at said meeting defendant Dale, representing that he had control of said property, stated to plaintiff's manager that the price thereof was $9,500, and that the parties then discussed the terms of such sale; that following such discussion, the parties visited the defendant bank and submitted to its president such proposed price and terms, which were approved by him; and that thereafter and on the 2nd day of July, 1927, plaintiff's said manager and defendant Dale, by telephone conversation agreed upon a sale at a price of $9,000, of which $2,000 must be paid in cash, and that thereupon the plaintiff sent to the defendant bank a check for $500 to apply on such cash payment.

"That thereafter and on the 11th day of July, 1927, the president of the defendant bank came to Seattle and then and there executed to the plaintiff a conveyance of said property and received from the plaintiff a further cash payment of $1,500 and three certain promissory notes in the sum of $1,500 each, payable respectively, January 1, 1928, July 1, 1928, and January 1, 1929, with interest at 7%, which said notes were secured by a first mortgage upon said timber land in the sum of $4,500, and that said defendant bank further

received from the plaintiff one promissory note in the sum of $1,500, due July 1, 1929, and one promissory note of $1,000, due January 1, 1930, which said two last mentioned notes bore interest at 7% per annum, and were secured by a second mortgage upon said premises in the sum of $2,500.

"That thereafter and in further carrying out of said secret plan, defendant bank assigned and indorsed said last mentioned $1,500 note to defendant Dale and said $1,000 note to the defendant Noble.

"That during all of said time the defendant Noble was acting as agent of the plaintiff, and the plaintiff reposed in him trust and confidence; that at no time during said negotiations did any other agent or representative of plaintiff go upon or make any examination of said timber land, but that plaintiff purchased said property relying wholly upon the advice and counsel of the defendant Noble.

"That at all times during said negotiations, the defendant bank knew that Noble was the agent of the plaintiff, and that if defendant bank did not in fact know of the collusion between defendants Dale and Noble, it did have knowledge of facts sufficient to put it upon inquiry, and to charge it with the duty of communicating those facts to the plaintiff.

"That at all times during the said negotiations, the defendant Dale was the agent of the defendant Woodland State Bank, and was by it authorized to carry on the negotiations for the sale of said timber land to the plaintiff.

"That the defendant Noble was guilty of fraud and duplicity in the discharge of his duties as agent of the plaintiff, and that by such fraud and duplicity, and by the secret agreement between the defendant Noble and the defendant Dale, the agent of the defendant Woodland State Bank, the plaintiff was induced to pay a false and excessive price for said timber, and that the said $1,000 note was assigned to the defendant Noble as his share of the result of said secret agreement."

Further findings were made pertinent only to the form of the decree entered. Following these, the following finding was made:

"That, after the commencement of this action and prior to the trial thereof, the plaintiff and defendant George E. Noble had an accounting and settlement of all their affairs, and that in pursuance thereof said defendant George E. Noble turned over to plaintiff certain stock in the Red Cedar Shake Corporation and an interest in certain patent rights, together with the note for one thousand dollars ($1,000), which said defendant had received from the Woodland State Bank, and plaintiff and said defendant Noble thereupon entered into a written stipulation which provided that said defendant Noble should be and was released from all liability by reason of the transactions involved in this action, but which stipulation contained a provision that the same should not be construed or considered as a release of the defendants Woodland State Bank or E. E. Dale, or either of them. Foregoing is evidenced by defendants' exhibits A and F, which are by reference made a part of foregoing finding as basis of said finding."

The appellant Woodland State Bank challenges the judgment entered against it on the ground that it is not warranted by the facts found by the court. The challenge is based on two separate grounds: First, that it does not appear that it actively participated in the fraudulent acts of Dale and Noble, or benefited thereby, or completed the sale with guilty knowledge of the perpetration of the fraud; and, second, because the complaining party, while the cause was pending and prior to the entry of the judgment against it, received full satisfaction for the wrong. The appellant Dale challenges the judgment on the second ground stated.

The second ground stated presents the question to which the arguments of the parties are principally directed; but it may be said in passing that we find no justification for the first. It may be that the appellant did not actually participate in the fraud, and it sufficiently appears that it did not actually profit

thereby. But it was the owner of the property, and had offered it for sale at a stated price. It took part in the immediate proceedings leading up to a consummation of the sale, knowing that its agent Dale had misrepresented the purchase price, and knowing that Noble in his participation in the dealings was the agent of the purchaser. It sold the property for the increased purchase price, and so arranged the terms of payment as to enable it to deliver to Noble and to its own agent the increase of the purchase price, and, immediately after the sale had been consummated, did turn over to them the proportion of the price over and above that at which it originally offered the property. That the transaction was a fraud on the purchaser, it needs no argument to demonstrate, and it seems to us equally clear that the appellant, at the time it closed the transaction at least, had guilty knowledge of the fraud committed by Noble and its agent.

The second of the stated grounds presents a more difficult question. The courts are not agreed upon the question whether a release of one of several joint tort feasors is a release as to all, and the cases present a variety of opinion. In instances where the action is purely one of tort in which the damages are unliquidated, there is but little dissent to the proposition that a release of one is a release as to all. The principal conflict arises in instances where the amount of the recovery is measured, and there has been a partial satisfaction only; many cases holding that the release of one in such an instance is not a release of the others, and others holding that it is a release *pro tanto* only. But we do not feel that we need cite or discuss the cases from jurisdictions other than our own. The question has been before us in practically all of its phases, and we have with unanimity held that a release of one joint tort feasor is a release of

all, whether the release be partial or in full, whether the amount of the recovery be unliquidated or measured, and whether the release to the one be with the express reservation that it shall not apply to the others.

In *Abb v. Northern Pacific R. Co.*, 28 Wash. 428, 68 Pac. 954, 92 Am. St. 864, 58 L. R. A. 293, the action was to recover for personal injuries received in a collision resulting from the joint negligence of two railway companies. The injured person for a stated consideration released and discharged one of the companies from all liability for the injuries arising out of the collision, the release reciting that it was not to be taken or considered as a release of the liability of the other company. In a subsequent action instituted against the other company, it set up the release as a defense to the action. The trial court, however, refused to give it effect as a complete satisfaction, and allowed a recovery against the defendant. On the appeal we reversed the judgment, using this language:

"The trial court construed the written release in its legal effect to be a mere covenant on the part of respondent not to sue the street railway company in consideration of the payment of $300 and the issuance to him of a pass for one year, and instructed the jury that it was not a full bar to the action against appellant, but that they should deduct the amount so paid from what they should find the whole damage to be, if they found such whole damage to be greater than the amount paid, and should return a verdict for the balance. It is evident from the pleadings that but one wrong was committed, and that was the joint wrong of the street railway company and the appellant. The two companies jointly committed the tort from which the injuries arose, and there can be no question but that said release and payment fully released and discharged the street railway company, one of the joint wrongdoers, from responding to any further demand for damages. In whatever light the release be viewed,

whether as a mere covenant not to sue the street railway company, or as an absolute discharge thereof, there can be no doubt that it could be pleaded in full bar of any action against the street railway company for further damages. It is, and has long been, a generally recognized rule that there is no line of separation between the liability of joint tort feasors. The tort is a thing integral and indivisible, and any claim for injuries arising therefrom runs through and embraces every part of the tort. The liability of one cannot be carried into any portion of the joint tort that is not followed by an equal liability of the other tort feasors. Each is liable for the whole, and the injured party may pursue one separately, or he may pursue all jointly, or any number jointly less than the whole number. This principle is discussed in *Doremus v. Root,* 23 Wash. 710 (63 Pac. 572, 54 L. R. A. 649), and *Birkel v. Chandler,* 26 Wash. 241 (66 Pac. 406). But while they may be thus pursued separately or jointly, yet there can be but one satisfaction.''

Discussing the effect of the reservation in the release, we further said:

''It is urged that the release in the case at bar amounts to no more than an acknowledgment of partial satisfaction of the entire demand, and that this is made clear by the reservation of a right to make further demand of appellant, which appears at the conclusion of the written instrument set out above; in other words it is insisted that the parties to that agreement did not intend it to be a release of appellant. As we have seen, however, they did intend it to be a release of appellant's joint tort feasor. Respondent's counsel frankly concede that there is conflict of authority upon this subject, but insist that the construction placed upon the release in question by the superior court is the reasonable one in order to give effect to the intention of the parties. The following cases, however, not only support those already cited, but further hold that in an action to recover for a joint tort, if the plaintiff shall receive money in satisfaction of the wrong done him by one party, it is a satisfaction as to all, and they

are thereby discharged of all liability to plaintiff, whether the parties to the release agreement intended it to so operate or not. See *Brown v. Kencheloe*, 3 Cold. 192; *Ellis v. Bitzer*, 2 Ohio, 89 (15 Am. Dec. 534); *Ayer v. Ashmead*, 31 Conn. 447 (83 Am. Dec. 154); *Mitchell v. Allen*, 25 Hun. 543; *Gunther v. Lee*, 45 Md. 60 (24 Am. Rep. 504). In the cases last cited there were reservations to the effect that, notwithstanding the release of one, others who were jointly liable should not be thereby released; but in each instance it was held that the release of one operated in law to release all."

The principle involved was approved by this court in *Randall v. Gerrick*, 93 Wash. 522, 161 Pac. 357, L. R. A. 1918D 179, and was followed in the case of *Martin v. Cunningham*, 93 Wash. 517, 161 Pac. 355, L. R. A. 1918A 225.

The question next arose in *Larson v. Hodge*, 100 Wash. 419, 171 Pac. 251. The facts necessary to an understanding of the question involved, in brief, are these: Hodge was sheriff of King county, and he, together with one Anderson and others, had been guilty of acts which wrongfully deprived the predecessor in interest of the plaintiff of a steamboat. The plaintiff sued Anderson and another for the value of the boat and recovered a judgment against them for $2,350. While the action was pending, the plaintiff instituted an action against Hodge to recover on the same cause of action. Hodge answered, setting up the judgment against the other wrongdoers as a defense. The trial court held that the matter pleaded did not constitute a defense, and a judgment was obtained against Hodge for $1,800. Hodge appealed to this court, where the judgment was affirmed. In the course of the opinion we said:

"Appellants contend that the judgment obtained in the suit against Anderson is a bar to the present action

against the sheriff. The only injury complained of in either action is that plaintiff was deprived of the steamboat. It is immaterial whether we call the action against Anderson trover, conversion, or assumpsit, or say that the action against the sheriff is a survival of the old common law action of amercement, or hold that it is maintained by virtue of Rem. Code, § 4000. The wrong done to the plaintiff is the same. It was not the wrongful execution of the bill of sale that gave plaintiff a right of action in either case. Both actions grow out of the illegal retention of the steamboat. It is too well settled to need citation of authority that joint tort feasors may be sued either jointly or severally, and that a judgment against one is not a bar to suit against another. While plaintiff can have but one satisfaction for her wrong, yet, as between Anderson and the sheriff, neither can set up anything less than a satisfaction of a judgment against the other as a bar to an action.''

The aftermath of the last cited case arose in the subsequent case of *Larson v. Anderson,* 108 Wash. 157, 182 Pac. 957, 6 A. L. R. 621. After the remittitur went down in the case of *Larson v. Hodge,* the judgment debtors paid the judgment in full, with interest and costs. Thereupon Anderson, one of the judgment debtors in the other case, moved the trial court to satisfy the judgment against him, which motion the court granted. The plaintiff in the action appealed, contending that the payment should have been allowed as a partial satisfaction only. Speaking to this question, we said:

''Another contention is that it was error for the trial court to require the satisfaction of the judgment against Anderson except to the extent of $1,800; or, in other words, that the plaintiff was entitled to the additional sum of $550 before she should be required to satisfy the judgment against Anderson, which was the excess of the judgment in that case over the amount of the judgment in the case against the sheriff.

"It is claimed that the receipt of the money upon the judgment in the case against the sheriff was under an agreement or understanding between the parties that it should operate only as a *pro tanto* satisfaction of the judgment in the case against Anderson. It is the rule in this state that the acceptance of money in satisfaction of a claim against one joint tort feasor, even with the reservation that it is not to be considered as a release against another joint tort feasor, operates as a release of the latter."

The question was again before us in the case of *Betcher v. Kunz,* 112 Wash. 563, 192 Pac. 955. The complaint in the action charged a conspiracy to defraud. It named as parties defendant Kunz, Lanphere, Simons, Rice, and a number of others. It was charged that certain of the defendants, acting in their own behalf and in the behalf of the others, organized a corporation for the ostensible purpose of manufacturing and selling a signal device for use on automobiles, but having for its actual purpose the sale of its corporate stock to enable the parties to recoup losses they had sustained in their dealings in the corporate stock of another corporation; that, in pursuance of the conspiracy, they divided the stock among themselves without paying or obligating themselves to pay the par value of the stock to the corporation, and proceeded to sell the stock to any and all persons who could be induced to buy it. It was further alleged that Lanphere sold ten thousand shares to the plaintiff Betcher, taking his note for $10,000 in payment; that later others sold him five thousand shares of the stock, taking in payment his notes aggregating $5,000; and that still later Simons and Rice sold him fifteen thousand shares, taking in payment three notes of $5,000 each. After learning that he had been defrauded, Betcher settled with Lanphere for his participation in the fraud, procuring a return of the note

given him on surrendering to him the capital stock purchased from him, paying him $500, and releasing him

". . . from any and all further pecuniary liability for and on account of or connected with the sale of any of the stock of said company to the said Julius A. Betcher."

The notes given by the plaintiff, other than the note to Lanphere, were indorsed by the payees for value to innocent holders, and the relief sought was the face value of the notes with interest. The defendants answered denying the fraud alleged, and pleading affirmatively the settlement and satisfaction with the defendant Lanphere. On the trial of the action, the facts relating to the settlement with Lanphere were shown, whereupon the court, on the motion of the defendants, withdrew the cause from the jury and entered a judgment dismissing the action. On the appeal we affirmed the judgment, resting our decision on the rule that a settlement and satisfaction with one of several joint tort feasors was a settlement and satisfaction as to the others.

In *Sunset Copper Co. v. Zickrick,* 125 Wash. 565, 217 Pac. 5, it appeared that one W. W. Black and one Frank L. Bell were the owners of certain mining property which they were offering for sale at $90,000. Zickrick, one Scott and one Stevenson desired to purchase the property, and Zickrick was authorized to procure an option for its purchase. Scott advanced to Zickrick the sum of $1,000 for the purpose of procuring the option, and for that sum procured from Black an option to purchase the property at the stated price of $100,000. Black at the same time, however, gave to Zickrick the following writing:

"Whereas, the undersigned, W. W. Black, gave a

receipt to J. E. Zickrick for one thousand dollars ($1,000) for an option on the Sunset property for the price of one hundred thousand dollars ($100,000).

"Now, therefore, it is agreed that the real price is ninety thousand dollars ($90,000) to Zickrick, that anything in excess of ninety thousand dollars ($90,000) is to be paid to J. E. Zickrick.

"Dated this 9th day of March, 1916.
"W. W. Black."

Zickrick reported to his co-purchasers that the "bed rock" price of the property was $100,000, and they afterwards took up the option, obligating themselves to pay for the property the price as so stated. Afterwards, Scott and Stevenson learned of the agreement with Zickrick, and brought an action against Zickrick and Black to recover the excess sum agreed to be paid for the property. A part of the sum was claimed by other parties, who intervened in the action. While the action was pending, a settlement was had with Black whereby Black paid to the plaintiffs and the interveners the sum of $5,000, on condition that the action be dismissed as to him with prejudice. The agreement with Black was reduced to writing, in which it was provided that it should not operate as a release as to the defendant Zickrick. Thereafter, in accordance with the agreement, the action was dismissed as to Black with prejudice. When the action came on for trial against Zickrick as the remaining defendant, the agreement with Black was shown, whereupon the court entered a judgment dismissing the action, and this judgment we affirmed on an appeal therefrom. In the course of the opinion it was said:

"The controlling question is whether the release of Black was a release of the action against Zickrick, a joint tort feasor. The rule is that the acceptance of money in satisfaction of a claim against one joint tort feasor, with a reservation that it shall not be con-

sidered as a release of another joint tort feasor, operates as a release of the latter.''

■ Manifestly, we think, these cases cannot all be differentiated from the case now before us, and unless they are to be departed from, they control the question under consideration against the conclusion reached by the trial court. But we do not feel warranted in making such a departure. The rules themselves have long stood in our printed decisions as the announced principles governing in such cases, and under the principle of *stare decisis* they should not be departed from without some very urgent need requiring it. But we find no such need. The rules are not without reason in their support. If a person, wronged by the joint act or combined acts of several wrongdoers, may settle with one of them without affecting his right of action against the others, he may settle with more than one, and may receive more than one satisfaction for the wrong which has been done him. It is not the policy of the law to permit this. The rule is general that a party wronged may not receive more than one satisfaction for the wrong.

Again, the rule that there can be no contribution between wrongdoers is not a rule of universal application. Many instances arise where there may be such a contribution, and if the one of several wrongdoers is sued for his participation in the wrong and may not set up a settlement and satisfaction with his co-wrongdoers, he may be deprived of a substantial right.

■ But it is contended that the cited cases are without application to the situation here presented. It is pointed out that the cases are actions at law, while the present case is one in equity, and it is argued that equity, being capable of doing exact justice, will relieve where there is no remedy at law. This, however,

is a mistaken view of the principle on which the cases are rested. The cases are not rested on the ground of want of a legal remedy, but are rested on the ground of a want of a cause of action. In other words, it is held that, while the complaining party originally may have had a cause of action against a number of wrongdoers, he satisfies his cause of action against all of them by accepting satisfaction from one of them. Courts of equity, it is true, will administer remedies for rights which are not recognized in law, but the principle which sustains the jurisdiction of the court to administer such relief is the same as that at law. There must be an existing cause of action. Equity will not create a cause of action, nor will it revive a cause of action which has been satisfied at law.

In this instance, the respondent's cause of action has its foundation in the wrong of the appellants. While the form of the relief asked is a rescission of the contract of sale, the foundation for the relief is the fraud practiced upon it by the other parties to the contract. Stated differently, the relief sought is relief from the injury suffered by it caused by the wrong of the other parties. When therefore it accepted satisfaction from one of the wrongdoers for that wrong, its cause of action ceased to exist, and, having no cause of action, it is no more entitled to maintain a suit in equity for the wrong than it is entitled to maintain an action at law.

Our case of *Williams v. Duke,* 125 Wash. 250, 215 Pac. 372, is in point on the principle involved. There, the rights of the appellant were governed by a positive statutory rule. The appellant invoked the aid of equity to relieve himself from the force of the rule. We denied him relief, using this language:

"There is no lack of positiveness in the law. In such situation equity does not attempt to assail or abrogate,

but follows and is subordinate to the law. In discussing this principle the supreme court of the United States, in *Magniac v. Thomson,* 56 U. S. 281, 14 L. Ed. 696, said:

" 'That wherever the rights or the situation of the parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *equitas sequitur legem* is strictly applicable.'

"Upon the same subject, see, also: *Beeson v. Brotherhood of Locomotive Firemen and Enginemen,* 101 Kan. 399, 166 Pac. 466; *Allen v. Kitchen,* 16 Idaho 133, 100 Pac. 1052."

■ The respondent suggests certain practice questions which it contends prevent the court from inquiring into the matter last considered. It will be observed that the trial court, after finding that the respondent and Noble had an accounting and settlement of all of their affairs, in which accounting and settlement the respondent entered into a written stipulation with Noble whereby it released him from all liability by reason of the transactions involved in the action, added that the finding was evidenced by certain exhibits "which are by reference made a part of the foregoing findings as a basis for said findings." These exhibits were not brought to this court in the record furnished by the appellants, and the contention is that they formed a part of the findings of the court, and that without them this court cannot know whether or not error was committed by the trial court. But the exhibits were subsequently supplied, and this cures the supposed defect in the original record.

■ As we have before noted, the plaintiff has appealed from the judgment of the court dismissing the action as to Noble. On this branch of its case, it contends that the documents on which the court based the finding do not constitute a release, and, in consequence,

do not justify the finding. But to this contention we think it sufficient to quote from the signed document. In so far as it is pertinent to the question involved, it reads:

"The undersigned, George E. Noble and J. E. Pinkham Lumber Company, mutually acknowledge that neither has any claim or demand of whatsoever nature against the other; and does hereby waive, release and discharge any claim or demand which might otherwise exist."

Again, it is said that no consideration is shown for the release. But, aside from the fact that a promise on the part of one party to an agreement is sufficient consideration for the promise on the part of the other party, the court found that Noble surrendered to the plaintiff the note he received in the transaction and turned over to it certain stock in a corporation and an interest in a patent right. It is true that the value of the property taken over in addition to the note is not shown, but since the plaintiff saw fit to exact the property, the court will not presume it to be without value.

The judgment appealed from is reversed and the cause is remanded with instructions to enter a judgment in favor of the defendants to the effect that the plaintiff take nothing by its action.

MITCHELL, C. J., PARKER, MAIN, BEALS, FRENCH, and MILLARD, JJ., concur.

HOLCOMB, J. (dissenting)—I dissent.

I concur in the disposition of the first question in the prevailing opinion.

But, as at present advised, I cannot agree that, in a suit to rescind a purchase and recover the proceeds thereof in the hands of the only party having any title or interest therein, the case should be governed by our long-standing rule as to releases of one or more joint

tort-feasors of liability for any damages, and then proceeding against another of the joint tort-feasors.

Such a case as this, it seems, should be governed by the rule applied in *Veazie v. Williams,* 8 How. (U. S.) 133, 12 L. Ed. 1018. There, by the subterfuge of "by-bidding," a party was fraudulently induced to purchase property at an auction sale, at a sum of more than he would otherwise have had to offer or pay, and at more than its real value. A release had been given to the auctioneer, who had participated in the fraud. It was urged that this released the defendant, in a suit to rescind the purchase and recover the purchase price. The court said:

"Again, in the present instance, there was no joint liability at law by the respondents and the auctioneer. Their accountability was separate, and resting on different grounds; his, on actual falsehood; theirs on the adoption of the benefits of it, and the accountability thus arising for it. The release of one, therefore, is not like the release of a joint contractor or joint trespasser."

That principle seems to fit the proposition here involved, precisely.

TOLMAN, J. (dissenting)—I cannot concur in the disposition of the second question by the majority. The authorities upon which the opinion rests are all cases of actions at law to recover damages for tort. Not one involves the equitable right of rescission.

Theoretically, the rule that the release of one joint tort-feasor releases all, is sound in law actions, because, and only because, the law recognizes the right to but one recovery for a single wrong, no matter how many persons may have participated in the tortious act. Practically, the rule often results in injustice. Hence in modern times, by statute and otherwise, in

most jurisdictions where the common law prevails, the rule has been departed from.

While we still adhere to the rule, we should not now undertake to extend it to equitable actions where there never was and never can be any sound reason for its application.

In an action for rescission, the broadest possible relief is to place the parties in *status quo*. Hence, there can be no double recovery in any event. So, here, by the judgment of the trial court, the parties were placed in *status quo* only, and there was no double recovery asked for or given.

The majority has produced no authority for the application of the rule to an equitable action for rescission. Counsel has cited no such authority, and I doubt if a well considered case can be found which will sustain the position here taken by the court.

I therefore dissent.