[No. 22219. Department One. December 30, 1930.]

SPOKANE SAVINGS & LOAN SOCIETY, *Respondent*, v. PARK VISTA IMPROVEMENT COMPANY *et al., Defendants,* A. DALK & COMPANY *et al., Appellants,* MONTGOMERY ELEVATOR COMPANY *et al., Cross-Appellants.*[1]

[1]Reported in 294 Pac. 1028.

*Herr, Bayley, Croson & Innis, F. Bartow Fite, Schwellenbach, Merrick & Macfarlane, Bausman, Oldham & Eggerman, Edw. L. Rosling, R. J. Meakin, Rummens & Griffin, Groff & Moran, W. Harold Hutchinson, C. A. Schneider, Revelle, Simon & Coles, Arnold Beezer,* and *Bronson, Jones & Bronson,* for cross-appellants.

*Edwin C. Matthias,* for respondent.

MILLARD, J.—The two appeals, which are consolidated, of certain lien claimants, from decree of July 10, 1929, foreclosing mortgages and mechanics' and materialmen's liens and from an order of October 5, 1929, confirming sheriff's sale of the apartment house property which is the subject-matter of this controversy, are before us upon the findings alone, appellants not having prepared a statement of facts. The Park Vista Improvement Company, the mortgagor of the property, has not appealed. Two of the lien claimants, Truax and Dalk, gave notice of appeal, but did not perfect

their appeals. They have not filed briefs, nor have they appeared in this court by counsel.

In the clerk's transcript are contained the trial court's memorandum decision and a written contract of respondent with two of the appellants respecting the purchase by the former of the liens of the latter.

■ The court's memorandum decision, as we said in *Lee v. Gorman Packing Corp.*, 154 Wash. 376, 282 Pac. 205, "... may not, in this court, be made to take the place of, and a substitute for, a statement of facts."

■ The findings recite that the contract was offered in evidence, and that the same was by reference made a part of the findings of fact; therefore the written contract may be considered as it is properly before us. *Pinkham Lumber Co. v. Woodland State Bank*, 156 Wash. 117, 286 Pac. 95.

The only question presented by the appeal from the decree of foreclosure, there being no statement of facts in the record, is whether the findings of fact, summarized as follows, support the decree.

In the latter part of 1927, the Park Vista Improvement Company was planning, but had not yet commenced, the construction of an apartment house on certain land in Seattle. On December 16, 1927, the Spokane Savings & Loan Society made a loan to the improvement company of $150,000 which was secured by a first mortgage upon the apartment house property. In January, 1928, the improvement company entered into a written contract with A. S. Hainsworth, Incorporated, for the construction of the apartment house for $219,000. The loan society was authorized by the improvement company to advance to the contractor, as the building progressed, a large portion of the loan. Part of the money was advanced by the loan society to pay existing mortgages upon the property,

commissions for the loan, taxes, title and recording expenses, and interest for six months on the principal indebtedness.

As receipts were presented from time to time to it by the contractor, the loan society advanced funds under the first mortgage until August, 1928, when all of the funds were exhausted. As the improvement company was without funds and it was unable to arrange for the payment of the contractor, the construction ceased. On September 1, 1928, the contractor negotiated with the loan society for additional money, and took over a majority of the stock of the improvement company. The loan society made a loan to contractor Hainsworth of $26,500 to be used in completing the apartment house. This loan was secured by a second mortgage on the apartment house property. The proceeds of the loan were distributed as follows:

For commission, $1,500; title and recording expenses, $64.75; to contractor Hainsworth, $16,435.25. The loan society retained $8,500, which it refused to pay to the contractor, for the reason that the loan society had discovered that lienable labor and material bills exceeding $40,000 were outstanding, and that most of them were prior to the loan society's second mortgage. The failure of the improvement company to pay the interest due on the two mortgages resulted in the commencement of an action by the loan society for the foreclosure of the mortgages. The improvement company, the contractor, and a number of lien claimants were made parties defendant. A receiver was appointed, liens were established as follows, and decree of foreclosure was entered July 10, 1929.

First Class. Receiver's certificates..$ 4,129.89
Second Class. Loan Society's first
    mortgage ........................ 169,304.38
Third Class. Appellants' labor liens.. 13,726.93

| | |
|---|---|
| Fourth Class. Appellants' material liens .............................. | 14,040.87 |
| Fifth Class. Labor lien of Truax..... | 2,415.56 |
| Sixth Class. Material liens of Truax and Dalk ........................ | 15,997.63 |
| Seventh Class. Loan Society's second mortgage ......................... | 20,694.56 |
| Eighth Class. Labor liens of a number of the appellants which were subordinated to the respondent's second mortgage on account of fraudulent receipts ........................... | 4,587.40 |
| Ninth Class. Material liens of a number of the appellants which were subordinated to the respondent's second mortgage on account of fraudulent receipts ........................... | 5,952.75 |

Total liens against the property. .$250,849.97

No labor was performed, and no material was furnished until some time subsequent to the date the first mortgage became a lien upon the apartment house property. Under the terms of the contract between Hainsworth and the improvement company, the contractor was to be paid $219,000 for the construction of the building. Of the loan of $150,000 secured by the first mortgage, $128,250 was to be paid by the respondent loan society, the mortgagee. The contractor was given a note of the improvement company for $39,750 (secured by a mortgage in that amount), $25,000 in preferred stock, and the contractor was to arrange for deferred payments by certain notes and conditional sale contracts in the amount of $16,000. That is, the contractor was to put into the building the amount represented by his preferred stock and the note, or a total of $64,750, less the amount he would make as a profit on the contract. This method of advancing money from the first mortgage funds was adopted by the re-

spondent to protect itself against liens over and above the amount of the first mortgage.

As agreed by the parties, respondent advanced mortgage moneys to the contractor, who furnished to the respondent from time to time statements to which were attached receipts showing payments made by the contractor for labor and materials used in the construction of the apartment house. This method enabled the respondent to check and compare its advancements with the expenditures made by the contractor, and assured the respondent that the contractor had at all times invested in the building a sum in excess of that advanced by the respondent up to date. A number of the appellant subcontractors gave receipts to the contractor reciting payment of the amounts represented by the receipts, which receipts were fraudulent. The subcontractors had not, in fact, been paid such amounts.

These subcontractors knew that the contractor was required to present receipts to the respondent to obtain mortgage funds from the respondent, and they gave fraudulent receipts to the contractor for that purpose. The fraudulent receipts were presented by the contractor to the respondent, and the contractor received from the respondent the amount represented by the receipts, as respondent was not aware that the receipts did not represent moneys already invested in the building by the contractor and moneys previously paid by the contractor to the subcontractors. In some instances the contractor did not turn any of the funds received on such fraudulent receipts over to the subcontractors who had given him the receipts; but in other instances he paid to the subcontractors a part of the money received from the respondent on the receipts. The excess of the amount of the fraudulent receipts given by the subcontractors over the amount

actually paid by the contractor to the subcontractors was $4,587.40 for labor, and $5,952.75 for material. The liens of those subcontractors, because of their fraud, were subordinated to the respondent's second mortgage, as shown by the above classification of liens.

The appellant Inlaid Floor Company, in which a man named Truax was a partner, had a valid lien in the amount of $9,086 for labor and material. Appellant C. A. Dalk had a valid lien for material amounting to $9,917.21. These liens were subsequent to respondent's first mortgage, but prior to respondent's second mortgage. Following the commencement of this action, the lien claimants, particularly Truax, insisted that the loan society pay the amount of their claims, threatening that, unless the loan society paid their claims in full, Truax could and would purchase the outstanding liens at a discount and force the respondent, in order to protect its second mortgage, to pay one hundred cents on the dollar for such assigned claims.

The threat meant that Truax and Dalk would, at the sheriff's sale, put up the amount necessary to cover the first mortgage, thereby compelling respondent, in order to protect its second mortgage, to in turn pay over the amount necessary to pay off all of the intervening claims; or that Truax and Dalk would accomplish the same result by redeeming from the sale. As a preliminary to such action, but without the knowledge of the respondent, which was acting in good faith in the matter, and merely trying to protect its own interests, Truax called a number of the lien claimants together and proposed that they stand together with the view of protecting their claims. While attending that meeting Truax made a form of offer over the telephone to the respondent's attorney that, if the respondent would dismiss the foreclosure suit, he, Truax, would pay the respondent $150,000 in satisfaction of its first

mortgage. Truax and Dalk became more persistent in their threats of what they would do if the respondent loan society did not agree to buy their claims at their full value; and in January, 1929, the respondent entered into a written agreement with the two lien claimants, Truax and Dalk, for the purchase of their liens, which contract is designated as "Dalk's Exhibit 6."

Appellants contend that Dalk's Exhibit 6 is an agreement not to bid at a judicial sale and is an agreement to chill and suppress such bidding, hence void and unenforceable, therefore the liens appearing in the third, fourth and eighth and ninth classes should be advanced to a position directly behind the receiver's certificates and prior to the respondent loan society's first mortgage.

The findings of the court with reference to the existence of the lien claims of Truax and Dalk and the agreement that they made concerning the purchase of the liens by respondent read as follows:

"The defendant and cross-complainant Inlaid Floor Company, a corporation, a co-partnership composed of R. S. Truax and F. Dubail, is a lien claimant in the sum of $9,086, of which $2,024.25 is for labor and $7,061.75 is for material. The defendant and cross-complainant A. Dalk & Company, likewise a co-partnership, is also a lien claimant for the sum of $6,831.65 for material. Subsequent to the commencement of this action these lien claimants, particularly Mr. Truax, were insistent upon the payment of their claims by the plaintiff, threatening to compel plaintiff to protect the lien of its second mortgage by buying up the outstanding liens, unless their claims were paid one hundred cents on the dollar, said Truax representing to plaintiff that he could and would purchase said outstanding liens at a discount and require plaintiff to pay them one hundred cents on the dollar on such assigned claims. This threat meant that said Truax and Dalk would at judicial sale bid above the amount necessary to cover the first mortgage, thus forcing plaintiff in

order to protect its second mortgage, to in turn bid over the amount necessary to pay off all the intervening lien claims, or that said Traux and Dalk would accomplish the same result by redeeming from said sale. *As a preliminary to such action, but entirely without the knowledge of the plaintiff, whom the court finds to have been acting in good faith in the matter and merely trying to protect its own interests,* Mr. Truax called a number of the lien claimants together and proposed to them that they all stand together with the view of protecting their claims, and while at that meeting Mr. Truax made a form of offer over the telephone to plaintiff's attorney, that if plaintiff would dismiss the foreclosure suit he would pay plaintiff $150,000 in satisfaction of its first mortgage.

"The said Truax and Dalk became more persistent in their threats of what they would do if plaintiff did not agree to buy their claims at their full value, in January, 1929, the plaintiff entered into a written agreement with said Inlaid Floor Company and said Dalk & Company, known in this case as Dalk's Exhibit 6, which exhibit is hereby referred to and made a part of these findings in which agreement is recited the existence of said two claimants' claims, the commencement of this action against said defendants, the filing of liens against the property which is the subject of this action aggregating $53,000, or more, the jeopardy of plaintiff's second mortgage by virtue of the outstanding lien claims and prior conditional sale contracts, and the financial ability of Inlaid Floor Company and A. Dalk & Company to acquire the mortgaged property at sheriff's sale or to redeem therefrom, and thus force plaintiff to pay all of said liens in full, and also reciting that plaintiff believed the investment of such a large sum of money in said property would be inadvisable and perhaps unwarranted. The agreement then recites that the plaintiff agrees to purchase and the two claimants agree to sell said two claims as and when the same have been reduced to judgment, for the amount of such judgment. It is provided that the foreclosure of said liens shall be handled by the attorney for plaintiff in the name of the attorney for said

claimants, and the plaintiff shall not contest the fore-closure, and if said liens are established plaintiff will buy the judgments, and that if the claims are only partially established as liens the plaintiff shall have the option of purchasing only such part of said liens as are established as liens and foreclosed as such, that plaintiff will pay the attorney for the two lien claim-ants his fees, the amount to be agreed upon between the two attorneys representing the parties to the agree-ment, in consideration of the amount of fees awarded by the court for such foreclosure. It is further pro-vided that the Inlaid Floor Company, and A. Dalk & Company will not individually, or as a firm, partici-pate, directly or indirectly, in assisting any other per-son by advice or financial help in financing or refinanc-ing the defendant Park Vista Improvement Company or the Park Vista Apartments, in redeeming or at-tempting to redeem the property from sheriff's sale. Finally, it is provided by said agreement that until after the sale of the property by the sheriff, the exist-ence of the agreement shall not be disclosed.

''After the execution of the agreement referred to in the preceding paragraph and the negotiations leading up to it, the said lien claimants, Inlaid Floor Company and A. Dalk & Company apparently lost their former interest regarding the collection of the lien claims, so far as the other lien claimants were concerned; at any rate, they expressed themselves to the other lien claim-ants that the Park Vista was 'sour.' *There is no evi-dence that plaintiff ever knew that the other lien claim-ants were relying or claimed a right to rely upon said Inlaid Floor Company and said Dalk & Company, or that it had any knowledge about any meetings of the lien claimants either before or after said Dalk Exhibit 6 was executed.*

''The court does not believe that either Mr. Truax or Mr. Dalk, or any of the other parties, at any time intended to commit any fraud upon any other parties to this action, but, construing the acts of Mr. Truax and Mr. Dalk before and after entering into said agree-ment, in connection with the terms of said agreement, the court finds the effect of said contract and said acts

taken together was to lull the other lien claimants into inactivity so far as concerted action was concerned.

"At the trial of this cause, the plaintiff introduced evidence with respect to the liens of the Inlaid Floor Company and A. Dalk & Company as a part of its case, and during the introduction of this evidence it called one of the Mr. Dalks to the stand, and upon cross-examination he was asked if he had any agreement relating to the sale of his claim. Upon answering in the affirmative, counsel for plaintiff and for the Inlaid Floor Company and A. Dalk & Company produced the agreement hereinabove referred to and known as Dalk's Exhibit 6, and the said agreement was there-upon offered in evidence by the attorneys for the plaintiff *and the attorney for the said lien claimants Inlaid Floor Company and A. Dalk & Company*." (Italics are ours.)

The agreement between Truax, Dalk and the loan society reads as follows:

"(a) WHEREAS, The Floor Company and the Dalk Company furnished materials for the construction of the Park Vista Apartments, located upon Lots One (1), Two (2), Three (3) and Four (4), in Block Fifteen (15) of Cowen's University Park Addition to the City of Seattle, King County, State of Washington, for which they have not received payment and for which liens have been filed by said materialmen against the said property, the lien of the Floor Company as filed being for Five Thousand Nine Hundred Five and 90/100 Dollars ($5,905.90) for labor and Three Thousand One Hundred and Eighty and 10/100 Dollars ($3,180.10) for material and the lien of the Dalk Company as filed being for Six Thousand Eight Hundred Thirty-one and 65/100 Dollars ($6,831.65) for labor and material; and

"(b) WHEREAS, the Society holds a first mortgage upon said real property and the apartment house constructed thereon in the sum of One Hundred Fifty Thousand Dollars ($150,000.00) and a second mortgage in the sum of Eighteen Thousand Dollars ($18,000.00) which mortgages are in default, and the Society has

commenced the foreclosure thereof, in which action it has joined the Floor Company and the Dalk Company as parties defendant; and whereas labor and material liens had been filed against said property in excess of the sum of Fifty-three Thousand Dollars and the Park Vista Improvement Company is indebted on account of furniture and fixtures in said apartment house under conditional sale contracts in a sum in excess of eighteen thousand dollars, which furniture and fixtures are required and necessary for the operation of said apartment house; and whereas the amount advanced by the Society on its second mortgage is jeopardized by the probability of intervening labor and material liens, and in order to protect its second mortgage the Society is confronted with the possibility of having to take care of the said labor and material liens and the payments on the conditional sales contracts, and the Society feels that the investment of such a large sum of money in said property would be inadvisable and perhaps unwarranted, and the Floor Company and the Dalk Company are financially able to acquire the property at sheriff's sale or to redeem from such sale and then force the Society in order to protect the amount advanced upon said second mortgage to pay all of said labor and material claims and assume the indebtedness on said conditional sales contracts; and whereas if the claims of the Floor Company and the Dalk Company are paid, the probabilities are that the Society will be in a position to protect the amount advanced upon its said second mortgage without the investment of said additional sum of money which it believes would be unwarranted; and

"(c) WHEREAS, the Floor Company and the Dalk Company are willing to sell their claims for which said liens have been filed, and the Society is willing to buy said claims when the same have been established and foreclosed in the action hereinabove referred to, believing that by doing so it can avoid the investment of a larger sum of money in said property:

"Now, THEREFORE, In consideration of the foregoing and of the following mutual and dependent covenants, the parties hereto agree as follows:

"The Floor Company and the Dalk Company agree to sell, assign, convey and set over to the Society, and the Society agrees to buy from the said companies the said claims against the said Park Vista Improvement Company, a corporation, arising out of the furnishing of material by the said Floor Company, and the said Dalk Company for the construction of the said Park Vista Apartments, upon the following terms and conditions:

"(1)  The Floor Company and the Dalk Company agree to foreclose their said liens in the above mentioned action, to-wit: Cause No. 214487, entitled Spokane Savings & Loan Society, a corporation, plaintiff, vs. Park Vista Improvement Company, a corporation, et al., defendants, now pending in the Superior Court of King County. The foreclosure of said liens shall be handled by the attorney for the Society in the name of the attorney for the said lien claimants, and the Society agrees not to contest the foreclosure thereof and further agrees that it will cooperate with said Floor Company and said Dalk Company in the foreclosure of said liens, and if the attorney for the Society does not do all that the attorney for the said lien claimants believes should be done in order to properly represent and protect the interest of said companies in the foreclosure of said liens, the attorney for the lien claimants shall have the right to intercede in behalf of his said clients and do what he thinks is necessary.

"(2)  Immediately upon the entry of a decree in said action establishing said liens and foreclosing the same, the Society agrees to pay to the Floor Company and to the Dalk Company a sum of money equal to the face value of said liens as established by said decree, including interest on said claims up to the date of said decree, and costs of action, exclusive of attorney's fees. It is further agreed between the parties hereto that the Society will pay the attorney for the lien claimants for the services that he renders in connection with the foreclosure of said liens, the amount to be paid for said services to be agreed upon between the attorney for the lien claimants and the attorney

for the Society, in consideration of the amount of attorney's fees awarded by the court in the foreclosure of said liens and in consideration of the work performed by each of said attorneys in connection therewith, the decision of said attorneys to be final and conclusive on said subjects.

"(3) Upon the payment of said sum of money hereinbefore agreed to be paid by the Society, the Floor Company and the Dalk Company agree to execute and deliver to said Society an assignment of said judgment and decree of foreclosure. In the event that the Floor Company and the Dalk Company, or either of them, are not successful in the said action in establishing a lien for the full amount of their claims, then the Society shall be obligated to purchase, and the Floor Company and the Dalk Company shall be obligated to sell said claims to the extent that said claims are established as valid liens against said property; but in such event the Society shall have the option of paying the full amount of the judgment obtained by said Floor Company and said Dalk Company, less attorney's fees as hereinabove provided, and taking an assignment of the entire judgment in favor of said parties.

"(4) In consideration of the agreement to purchase the claims of said Floor Company and said Dalk Company against the Park Vista Improvement Company, as hereinafter recited, the said Floor Company and the said Dalk Company, and R. S. Truax and F. Dubail and A. Dalk, J. E. Dalk and C. A. Dalk in their respective capacities, agree that they will not participate either directly or indirectly, or assist any other persons, firms or corporations by advice or financial help in financing or refinancing the Park Vista Improvement Company, its successors and assigns, or the Park Vista Apartments, or, if said property is sold at sheriff's sale in said action, in redeeming or attempting to redeem said property, together with the tenements, hereditaments, rights, privileges and appurtenances belonging to or used in connection therewith, from said sale; Provided, however, if the Floor Company and the Dalk Company, or either of them, are not successful in said action in establishing a lien for

the full amount of their claims, and if the Society shall exercise the right granted to it herein to take a partial assignment of said judgment to the extent that said claims are established as valid liens against said property, then and in that event the Floor Company and the Dalk Company, or either of them, shall have the right to redeem said property from said sale. If the said Floor Company and the said Dalk Company, or either of them, being entitled to redeem said property under the terms of this proviso, do so redeem said property from said sale, they, or either of them so redeeming, shall first pay to the Society, the amount which the court has adjudged to be due the Society in said second mortgage, together with interest, costs and attorney's fees.

"(5)   It is further agreed that the parties hereto, or any of them, during the pendency of the above entitled action and until after the sale of said property at sheriff's sale, if it is sold upon a judgment or decree entered in said action, will not disclose either directly or indirectly, to any other parties whatsoever that any agreement has been reached or considered between the parties hereto for the purchase of the claims of said Floor Company and said Dalk Company by the Society.''

Though the court concluded as a matter of law that the contract quoted above was an agreement restricting and chilling bidding at a judicial sale, the court expressly found that the respondent acted in good faith in the matter, and was merely trying to protect its own interests; that the respondent never had any knowledge of any meetings of Dalk and Truax with the other lien claimants, and that the respondent did not know "that the other lien claimants were relying or claimed a right to rely upon" Truax and Dalk.

No evidence having been brought to this court, it will be presumed on the appeal from the order of October 5, 1929, confirming the sheriff's sale of the apartment house property, in view of the recital in the court's order that the court,

". . . having heard and considered objections to the sale, that the sale was in all respects due and regular and that the price realized at said sale was fair and adequate, . . ."

that the contract did not chill the bids at the sheriff's sale.

In the absence of evidence of irregularity in a foreclosure sale, or if an affirmative showing is not made by appellant that the court abused its discretion in entering the order confirming a sheriff's sale, the presumption is conclusive that the action of the court was warranted by the showing made at the time.

"For guidance of the bar, we now announce the rule to be that this court will not in any case say that the judgment of the trial court is wrong upon questions of fact unless it has before it all of the evidence upon which the court passed judgment, and this fact must affirmatively appear from the record." *International Development Co. v. Sanger,* 75 Wash. 546, 135 Pac. 28.

This is a controversy between junior incumbrancers; the appellants on the one side as holders of labor and material liens, and the respondents on the other side as second mortgagees. The contract in question is an agreement by the respondent junior mortgagee to purchase the prior liens of Dalk and Truax in order to protect the respondent's interest in the mortgaged property. That the respondent, a junior mortgagee, may so protect its interest in the mortgaged property—that is, by paying off prior liens on the property and be thereby substituted under the doctrine of subrogation to the interests thus discharged, is well settled.

"It is a well-settled general rule that a mortgage lienor has the right to protect his interest in the mortgaged property by paying superior liens thereon; . . ." *Inland Empire Land Co. v. Douglas County,* 149 Wash. 253, 270 Pac. 812.

28

See, also, *Murray v. O'Brien,* 56 Wash. 361, 105 Pac. 840, 28 L. R. A. (N. S.) 998; *Catlin v. Miles,* 140 Wash. 1, 247 Pac. 1013.

It is not a condition precedent to the right of a junior lien holder to subrogation that such lienor have the consent of the debtor or other interested parties to the transaction. The junior lien holder may, without the consent of the debtor, strengthen his security by paying the amount due on the prior incumbrance and be subrogated to that lien. It was not unlawful or wrongful for respondent to agree to buy the liens of Truax and Dalk when same were established as valid. The position of appellants is no different than they would have occupied if the agreement had not been made, except that the liens of Dalk and Truax were subordinated to other liens of like nature; and with the exception of the labor and material liens of the eighth and ninth classes which were subordinated to the second mortgage and to the other liens because of the fraudulent receipts given to the contractor by those lien claimants as recited above. Otherwise, the relative rank of the liens is the same as though no agreement had been made. Appellants hold the same debt and the same security that they held before respondent made the contract with Truax and Dalk. Appellants have done nothing upon the faith of the acts of the respondent, who contends that the doctrine of subrogation is applicable. As said in *Backer v. Pyne,* 130 Ind. 288, 30 N. E. 21, 22, 30 Am. St. 231:

"The doctrine of subrogation is applicable here, notwithstanding the fact that the rights of a third person have intervened. Here the third person has in no respect changed position. He has done nothing upon the faith of the acts performed by the party who invokes the doctrine of subrogation. He holds the same debt and the same security that he held before the appellee acted in the matter. His claim is that he occupies a

better position than he would have done had there been no redemption from the Patrick sale. He asks to profit by the acts of another, who believed that he was protecting his own interests, and preventing the sacrifice of property, by advancing money to his embarrassed debtor. Clearly, the right of subrogation existed as against the debtor, and the position of the appellant, although he is a third person, is not such as to defeat the right. *Payne v. Hathaway*, 3 Vt. 212. The money was paid by the appellee under the belief that his mortgage became the senior lien, and he is entitled to seize whatever liens he paid that will protect him from the claims of persons whose liens are junior to those he paid.''

The situation created by Dalk and Truax in lulling into inactivity (without the knowledge of respondent who acted in good faith) the other lien claimants is a sufficient reason for giving priority to the other labor and material liens over the liens of Truax and Dalk. It would be indeed inequitable to advance the lien claimants of the eighth and ninth classes in view of the fraud practiced by them. Respondent should not be penalized for endeavoring to protect itself, as would be the case if appellants' liens were advanced ahead of respondent's first mortgage. In *Tillman v. Stewart,* 104 Ga. 687, 30 S. E. 949, 950, 69 Am. St. 192, a controversy between junior incumbrancers, very much like the case at bar, the court said:

''But the present holder of this senior mortgage is not the original mortgagee, whose only right was to enforce the collection of his debt. On the contrary, the defendant is, like the plaintiffs, a junior incumbrancer. He purchased the senior mortgage execution with a view to controlling the same, in order that he might thus be able possibly to protect a lien held by him which is even inferior to those held by the plaintiffs, if the latter are good. As between him and them, he certainly appears to have the more need of controlling the mortgage in controversy, if, indeed any neces-

sity exists that either should do so in order to secure protection. The plaintiffs have no concern in the property's selling for more than the amount called for by the senior mortgage and those held by themselves; whereas the defendant will, if the junior mortgages are valid, lose all participation in the fund, so far as his judgment is concerned, unless the property brings enough to more than satisfy all the mortgage liens.

. . .

"The conclusion is irresistible that where one of two junior incumbrancers, with equities evenly balanced, actually secures a transfer of a prior mortgage in the way of both, a court of equity would not be justified in depriving him of .the advantage thus honestly gained, in order that this very advantage might be conferred upon the other junior mortgagee. Such a thing would not be in harmony with the recognized principles of equity jurisprudence, which are daily applied in enforcing the doctrine that, where equities are otherwise equal, diligence on the part of one whereby he secures a fair advantage is not only permissible, but to be encouraged. A logical result growing out of the plaintiff's supposed right to compel Tillman to assign to them his superior lien would be to compel them, on his petition, to assign it back to him after they obtained it, thus presenting a sort of equitable game of battledoor and shuttlecock. Our attention has not been called to any case where any court has advanced or applied the rule that one junior incumbrancer can compel another, under any circumstances, to forfeit an advantage gained by procuring a transfer of a senior mortgage. Obviously, such a rule would be difficult of intelligent application and enforcement, for it must often happen that it is a question of grave uncertainty which of two or more persons holding junior liens is best entitled to the protection afforded by controlling a senior lien, if, perchance, any satisfactory solution whatever of the question can be arrived at."

The respondent acted in good faith, and should not, because of the bad faith of Truax and Dalk, have its mortgage subordinated to the liens of appellants.

''The early rule of law condemned without discrimination all agreements between persons not to bid at judicial or public sales. This rule, has, however, been modified, and it is now well settled in this state that, where such agreements are made for an honest purpose, and designed to protect existing interests, they are valid. The question as to whether the agreement in such a case was entered into with honest motives is for the jury to determine. . . . '. . . an agreement made by parties, one or more of whom has a lien upon, or an interest in, the property about to be disposed of at a public or judicial sale, is not against public policy, because it has the effect to prevent competition at such sale, provided it was made, not with the intent of producing that effect, but was fairly made to protect the lien or interest of the parties, or for any other reasonable and lawful purpose.' . . . 'And if either party contracts in good faith, he is entitled to the benefit of his contract, no matter what may have been the secret purpose or intention of the other.' '' *Delisi v. Ficarrotta,* 76 Misc. Rep. 488, 135 N. Y. Supp. 653.

''We rule, therefore, that the defendant is not to be denied the right to plead an estoppel under these facts. A finding to the contrary would be to hold that one is not entitled to employ all fair means to protect his interests. Plaintiff's conduct in this matter cannot be otherwise construed than as fraudulent; that of the defendant manifests no such feature. Until it becomes a part of the public policy to rob one person of his rights in order to secure those of another, we will not hold that an agreement fair in itself, but which is subsequently used by one of the parties thereto to perpetuate a fraud, will be held wholly void to the detriment of the other party. In short, the rights of one party, free from fault, will neither be curtailed nor denied by reason of the wrong of the other.'' *Vette v. Hackman,* 292 Mo. 138, 237 S. W. 802.

There was no agreement to endeavor to keep the general public from bidding. Though Dalk and Truax agreed not to bid at the sheriff's sale, that of itself

would not be sufficient to render the contract illegal. The rule against chilling bids at a judicial sale does not require the lien creditors of a mortgagor to bid against each other. Lien creditors may lawfully combine, so long as the combination only incidentally affects competition at a judicial sale, and does not have the restriction of competition for its main object, and so long as the parties to the combination do not agree to keep the general public from bidding.

We are in accord with the general rule to which appellants direct attention, that an agreement to chill or suppress bidding is void.

"The authorities clearly recognize the principle that where an agreement, without regard to its form, is made for the purpose of preventing free and fair competition, or of stifling or chilling biddings at public sales or in the letting of contracts by the government, or for the purpose of giving undue advantage to either of the parties thus engaged in dealing with reference to the biddings, it is contrary to public policy and void." 6 R. C. L., p. 809, § 209.

"One of the instances where the policy of the law is opposed to the stifling of competition is in the case of a public sale, especially if it happens to be a judicial sale. The object of such a sale is to get the best price that can fairly be had for the property. In order to safeguard the interests of those for whose benefit the sale is conducted, the rule has been established that an agreement for the purpose of suppressing competition at such sales is invalid, notwithstanding the fact that the agreement does not relate to a particular sale. Such an arrangement opens the door for oppressive speculation and operates as a fraud upon the persons for whose benefit the sale is conducted. The rule is clearly applicable to a case where a prospective bidder gives a consideration to another prospective bidder to induce the latter not to bid against the former. This is a species of bribery which cannot be tolerated." 6 R. C. L., p. 810, § 210.

"Generally speaking, any combination or conspiracy among bidders or others to suppress fair competition at a judicial sale for the purpose of acquiring the property at less than its fair value is a fraud which renders the sale invalid; any contract or agreement that is made for the purpose of chilling or whose necessary tendency is to chill the sale, lessen competition or restrain bidding at judicial sales is illegal because opposed to public policy, and no party to such agreement can enforce the same or derive any benefit therefrom, . . ." 16 R. C. L., p. 69, § 50.

"Since it is in the interests of justice that a judicial sale should be so conducted as to yield to the owner the best price that can fairly be had, free, fair and competitive bidding is contemplated at such a judicial sale, and the law does not tolerate any influence likely to prevent competition; and, as in the case of auction sales generally, any agreement, the object and effect of which is to chill the sale and stifle competition, any misinformation purposely or mistakenly given by which bidders are kept from attending or bidding, or any conduct on the part of those actively engaged in the selling or bidding that tends to prevent a fair, free, open sale or stifle or suppress free competition among bidders, is contrary to public policy, vitiates the sale, and constitutes ground for setting it aside upon the complaint of the injured party." 35 C. J., p. 39, § 53.

The qualification of the rule is stated as follows in the latter part of § 53, vol. 35, C. J., p. 41:

"Persons who, by virtue of liens or otherwise, have an existing interest in the property to be sold may lawfully combine together for the protection of their interests and may even expressly agree not to bid against each other, in furtherance of a plan to conserve their rights, provided their activities in so doing do not operate to exclude any of the general public from bidding; but where property sold for two-thirds its value, the fact that the buyer and two others who had come to bid, at the place of sale, formed a partnership for its purchase in his name and for an agreed price, was held good for setting it aside."

34

In the case at bar, there is no evidence that the property was sold for less than its value, and that there was a chilling of bids; in fact, the court expressly found that the price was fair and adequate. That recital in the court's order confirming the sheriff's sale is conclusive as to the question whether the price at which the property was sold was fair. There is no showing that the general public was excluded from bidding. There is nothing in the contract or in the court's findings of fact from which we may infer that the parties agreed to exclude the general public or that the general public was excluded from bidding. That the lienors entered into an agreement with the mortgagee not to bid at the sheriff's sale, would not bring the contract within the ban of the rule as to the chilling or suppressing of bidding. Lienors are not included within the phrase "general public." The meaning of the expression "general public" in the rule that lienors may combine and agree not to bid against each other if their activities do not exclude any of the general public from bidding, is stated as follows in *Investment Registry v. Chicago & M. Electric R. Co.*, 206 Fed. 488, 492:

"The general rule is that the public shall be free to bid for property offered at judicial sale, and the law prohibits the making of any bargain or the doing of any thing which takes from any part of the public this liberty of action. The term 'general public,' however, as used in this connection, does not include 'persons who, by virtue of lien or ownership or otherwise, have an existing interest in the property to be sold.' Such persons may combine together for the protection of their interests. They may even expressly agree not to bid against each other in furtherance of a plan mutually agreed upon as calculated to conserve their rights. But in so doing, their activities must not operate to exclude any part of the general public as purchasers at the sale."

To discuss all of the cited authorities, which are distinguishable on the facts from the case at bar, would unnecessarily further extend this opinion which is sufficiently long.

The decree and order appealed from are affirmed.

MITCHELL, C. J., TOLMAN, BEALS, and PARKER, JJ., concur.