[No. 29448. Department One. March 15, 1946.]

W. Thomas Conran, *Respondent,* v. White & Bollard, Inc., *Appellant.*[1]

[1]Reported in 167 P. (2d) 133.

*McMicken, Rupp & Schweppe, Hugh H. Benton, Jr.,* and *Mary Ellen Krug,* for appellant.

*Mifflin & Mifflin, J. Speed Smith,* and *Henry Elliott,* for respondent.

MALLERY, J.—The plaintiff brought an action on an oral contract. From a judgment based on the verdict of the jury, the defendant appeals.

The respondent is a builder and contractor. The appellant is a corporation engaged in the business of making mortgage loans and selling insurance. They entered into

a written agreement, April 29, 1937, which provided for the sale to respondent of a number of building lots which the appellant owned in the Hawthorne Hills Addition to the city of Seattle, at stated prices. The contract gave the appellant a preferential right to finance the construction and handle the insurance on houses to be built upon the lots by the respondent. At the time the agreement was executed, there were due and delinquent certain taxes and assessments against the property. The agreement provided that respondent should pay the outstanding taxes and assessments, and the amount so paid was to be applied on the purchase price of each lot.

The respondent paid taxes in the amount of $421.12 and assessments in the amount of $613.75, pursuant to the agreement, and received a bargain and sale deed from the appellant to the land. The respondent also expended $151.50 for surveying the lots, $88 for clearing them, $250 attorney fees incurred in connection with the contract, and $1,405 for house plans to be used in erecting houses thereon. The houses contemplated by the contract were, in fact, never constructed. Because of local conditions and economic conditions in general at that time, the contract was modified by mutual agreement of the parties in several particulars which are not the subject of any controversy in the instant case.

For taxes accruing subsequent to the contract and not paid by the respondent, the property in question was included in a regular tax foreclosure proceeding by King county. A tax judgment covering the property was entered on the 29th day of November, 1938. As a part of the proceeding, a public sale of the property was held on the 10th day of December, 1938, at which time the property was bid in by the county. Thereafter, and on the 3rd day of January, 1939, the King county treasurer gave a deed to the property to King county.

Our statutes governing the time for redemption of real property in such a case are Rem. Rev. Stat., §§ 11279, 11280 [P. P. C. §§ 979-293, 979-295]. By the provisions of § 11279:

"Any person owning an interest in lands or lots upon

which judgment is prayed, as provided in this act, may in person or by agent pay the taxes, interest and costs due thereon to the county treasurer of the county in which the same are situated, *at any time before the execution of the deed;* . . . " (Italics ours.)

Section 11280 provides:

"Real property upon which the certificates of delinquency have been issued under the provisions of this act, *may be redeemed at any time before the issuance of tax deed,* . . . " (Italics ours.)

In the case of *Sasse v. King County,* 196 Wash. 242, 82 P. (2d) 536, this court had before it the question of the power of county commissioners to allow a redemption after the expiration of the period provided for in Rem. Rev. Stat., § 11280. In holding that the county commissioners had no such power, we said:

"Rem. Rev. Stat., § 11280 [P. C. § 6882-119], gives a former owner of real property the right to redeem at any time before, but not after, the issuance of a tax deed, upon payment, in legal money, of the amount for which the property was sold, together with a prescribed rate of interest thereon."

The written contract, heretofore referred to, created the situation that induced the respondent to make the enumerated expenditures in connection with the land here involved. The treasurer's deed to King county of January 3, 1939, extinguished all the rights that either party had in the lots in question, and there was no right of redemption in the respondent. He became a stranger to the title to the land and had no greater rights therein than any member of the public.

This was the situation when on about April 1, 1939, the respondent read an article in the daily press relating to the advertised sale by the county treasurer of certain county owned property to be held on April 6, 1939, which included the property here in question. This sale was to be pursuant to Rem. Rev. Stat. (Sup.), § 11294 [P. P. C. § 979-325], which provides for the sale of real property previously acquired by counties in tax foreclosure proceedings. Such

a sale is on a different basis from a sale held in connection with a tax lien foreclosure action. Since the county owns the land, there is no one who has a right to redeem the property or take it out of the sale. The only way the county can be divested of its title, is for someone to purchase the property at the advertised sale.

After seeing the notice of the sale of county property, the respondent went to the appellant and, as he alleges, made the oral contract upon which he here relies.

Stripped of its details, it was simply that the respondent would not exercise his right of redemption, that is, would not pay the amount of the delinquent taxes and take the property out of the sale as advertised in return for the appellant's promise to pay him the amount he had invested in the property. This was to afford the appellant an opportunity to acquire the property at the advertised sale.

We set out the position the respondent took in his testimony:

"Q. What was the next thing that came up? A. I think the next thing was a conversation with Mr. Brice which was brought about by reason of my noticing in the paper one evening they were going to have a tax sale, or rather that a tax sale had been definitely set for the sale of the Hawthorne Hills lots. It was set, I think, for about April 6, 1939. I cut out the clipping and went to see Mr. Brice about my lots. He was in his office and I showed him the clipping and I said 'I see your tax foreclosure on Hawthorne Hills is getting under way and the date set. What are you going to do about the remaining twenty-four lots I have title to?' I said 'After all, George, I have approximately $3,000 tied up in there and cannot afford nor am I going to lose it, and rather than have them go at tax sale and have someone bid on them I will go to the treasurer's office and pay whatever necessary to take them out of the tax sale.' Mr. Brice said 'Don't do that, Tom. You know Ben and I have spent considerable time on the Hawthorne Hills deal. We have worked it out with the county treasurer, a wholesale program of the majority of the lots in the Hawthorne Hills Addition in which we are interested, particularly those not encumbered with heavy assessments and I believe your twenty-four lots are included in our over-all program.' I said 'That is fine, George, but that don't tell me where I

am going to get my $3,000 back and unless I do have definite assurance I am going to get it back I am going to pay taxes enough to keep them out of the sale, because I do have ten sets of plans ready to go ahead as soon as you are ready to make the loan.' He said 'Don't worry, Tom. You have done all your business with White & Bollard since you have been in Seattle. You have built lots of homes and we expect you to continue to build homes. I will personally see you don't lose anything on your personal investment on Hawthorne Hills. Let me talk it over with Ben and you come in in a day or so.' I said 'Okey, George, just so I know where I am coming out.' Q. Did you go back? A. I went back the next day, or it might have been the day following. I stepped into Mr. Brice's office. He asked someone to have Ben Smith come in and bring the Hawthorne Hills file. Mr. Smith came in bringing a yellow folder showing the legal description, taxes etc., on the Hawthorne Hills project. When Mr. Smith sat down Mr. Brice said 'Tom, Ben and I have decided to include your twenty-four lots in our over-all program.' I think he again repeated they had arrived at the prices they were going to pay in the tax sale. I said 'That is fine, George, but where does that leave me?' He said 'Well, Tom, don't you think it would be better if you devoted your time to your Windemere and Briarcliffe houses and improve the balance of your Briarcliffe lots? We will take over the twenty-four lots in Hawthorne Hills and allow other builders to develop them. They can do it much quicker than you.' I, again, said 'Okey, if I know I am going to get my $3,000 back.' That was the only thing, get my investment back. I was not interested in a profit but I did want my money back. I felt I was entitled to it. He said 'Tom, Ben and I have worked out a proposition we think is fair to all. We will take your lots, bid them in at tax sale, furnish all money necessary to buy them, clear the title, and when we have received back substantially all money we advanced, out of the next money secured you will receive your three thousand. After you have been paid we will keep the rest.' I again repeated it was okey with me. I was not looking for any profit on the deal. I think that was the sum and substance of it except Mr. Brice again repeated *he* he would absolutely see I didn't lose any money I had in the deal. He again repeated I had done all my business with them. I think that was all the conversation."

On cross-examination, the respondent testified as follows:

"A. I would either pay whatever necessary to the county

treasurer to take them entirely out of the tax sale or Mr. Brice would assure me I would get my money back. Q. By 'taking them out' you mean the way the lawyers say 're-deem them?' A. I understood I would pay a certain amount to the county treasurer. I was going to protect my invest-ment."

And in deposition, respondent testified:

"A. There were two meetings with Mr. Brice. I had read in the paper where Hawthorne Hills—it was published there they were going to have a tax sale on Hawthorne Hills, so I came in to see Mr. Brice and asked him 'How about my lots that I had title to?' I didn't want them sold at tax sale, and I was ready to go down and pay the taxes on them; . . ."

And later in his deposition:

"Q. What did you agree to do as a result of this conversa-tion? A. What did I agree to do? Q. Yes. A. I re-frained from going down and paying the taxes on my lots and taking them out of the tax sale. Q. Is that all? A. That is all there was to it, wasn't it?"

And still later in his deposition: "A. But what I meant by that, I knew property could be taken out of tax sale by a nominal payment."

The foregoing testimony was in support of paragraph 13 of the respondent's complaint, which is as follows:

"That but for said agreed mutual rescission of said con-tract of April 29, 1937, and the agreement for reimburse-ment by defendant to plaintiff of the sums of money there-tofore invested and expended by plaintiff in connection with said lots, plaintiff, prior to said tax sale, would have paid the taxes then against said property and by reason of the delinquence of which the said tax sale was being held, and would have taken said lots out of such tax sale."

The advertised sale was held in due course, the respondent did not appear, and the appellant was the successful bidder thereat on the property in question.

Subsequently, the respondent made demands for the amount of his expenditures in connection with the lots, which were refused by the appellant. Nearly four years after the sale, respondent brought this action on the oral

agreement with the appellant to recoup him for his expenditures and rescind the written contract.

■ The appellant contends that the contract is *nudum pactum* for the reason that the respondent did not forbear doing anything he had a right to do; that is, that the respondent did not have the right to redeem and take the property out of the advertised sale, and therefore it was not such a forbearance as would constitute consideration for a contract. We agree with the appellant.

■ In support of the judgment, the respondent contends that want of consideration is an affirmative defense and must be specially pleaded, which appellant did not do. Respondent relies upon *Nunn v. Jordan,* 31 Wash. 506, 72 Pac. 124, and *Gleason v. Brown,* 129 Wash. 196, 224 Pac. 930. Those cases are not in point, since they are concerned with negotiable instruments where the consideration was imported and want of consideration could only be asserted as an affirmative defense. The case at bar, however, is an action upon an oral contract. Consideration here is not imported and the lack of consideration can be shown under the general denial. The distinction was early recognized by this court in the case of *Griffith v. Wright,* 21 Wash. 494, 58 Pac. 582, quoting 4 Enc. Pl. & Pr., p. 946:

" ' . . . That if the contract in suit imports a consideration . . . the want of consideration cannot be shown under the general denial, but must be pleaded. If, on the other hand, the contract in suit does not import a consideration, thereby making it necessary for the plaintiff to allege a consideration, want of consideration may be shown under the general denial.' "

■ The respondent contends that the oral agreement of April, 1939, was a modification of, or a substitution for, the earlier written agreement, and that no new or independent consideration was required, as the original consideration attached to and supported the oral contract. In support of this argument, respondent cites *Long v. Pierce County,* 22 Wash. 330, 61 Pac. 142; *Stofferan v. DePew,* 79 Wash. 170, 139 Pac. 1084; *Dyer v. Middle Kittitas Irr. Dist.,* 25 Wash. 80, 64 Pac. 1009; *Winn v. Stanton,* 146 Wash. 328, 262 Pac. 645;

and *Pacific Power & Light Co. v. White,* 96 Wash. 18, 164 Pac. 602, Ann. Cas. 1918B, 125; *Id.,* 104 Wash. 528, 177 Pac. 313. The *Long* case, *supra,* was an action to settle claims and counterclaims stemming from completion of a building contract. The contractor attempted to show an oral modification of the contract which waived a provision therein to the effect that the contractor was obliged to give the county written notice of all claims for extra work within ten days after commencing such work. In answer to the objection that the modification was invalid for want of consideration, the court held:

"But no express or independent consideration was necessary. 'The contract, when modified by the subsequent oral agreement, is substituted for the contract as originally made, and the original consideration attaches to and supports the modified contract.' " *Long v. Pierce County,* 22 Wash. 330, 61 Pac. 142.

The other cases cited by the respondent are in accord with the *Long* case, *supra,* and state the rule to be applied in proper cases under similar facts.

The first requirement for the existence of a rescission or modification of a contract must be the existence of a contract capable of being rescinded or modified. Here the sovereign state by due process of law divested the parties of their interest in the land, without which the contract was inoperative. A formal rescission could do no more than recognize this existing fact.

The record is silent as to any claims between the parties based upon the factors that made the contract inoperative. The respondent did not claim that there was any dispute as to existing rights that were the subject of a compromise by way of a rescission of the contract. The respondent was not concerned with what his rights had been under the contract, but with what course the parties would take with regard to the land in the future. He sued upon the theory that he had contracted not to redeem the land in consideration of a sum of money in the amount of his past expenditures in connection with it. We do not think the old written contract constitutes a consideration, under these circumstances,

for the new oral agreement not to redeem the land, because it had no connection with it and the respondent did not present his case on the theory that it had.

Respondent now contends that the oral contract was a compromise settlement of the rights and claims of the parties under the earlier written agreement. Again we observe that the case was not tried by respondent on that theory. The record reveals no claim asserted against appellant as of the time the oral contract was made. Respondent had lost the land and his investment therein by the act of the state due to his own failure to pay the taxes.

As said in *Cannavina v. Poston,* 13 Wn. (2d) 182, 124 P. (2d) 787:

"The basic element of a compromise is a disputed claim. In 12 C. J. 316, § 6, under 'Elements and Essentials,' we find this statement:

" 'Rights or claims may be the subject of compromise, whether arising out of contract or tort; *but conflicting claims* are essential to the validity of a compromise, one of its essential elements being the existence of a bona fide dispute or controversy between the parties.'

"In volume 8, Words & Phrases (Perm. ed.), p. 311 *et seq.,* the citations all carry the thought that a 'compromise' is an agreement between two or more persons to amicably settle their dispute.

"It would seem to follow, then, that to have an offer of compromise, there must be an offer to settle a dispute."

It is that essential element which is lacking to sustain respondent's contention. At the time the oral contract was entered into, there was no dispute between the parties concerning their rights under the old written contract. There was no *claim* to be settled on either side; in fact, the old contract was not under consideration.

It is contended by the respondent that the appellant's defense is, in reality, one of impossibility of performance of the respondent's promise rather than want of consideration, and that the appellant was aware of the impossibility while the respondent was not. The respondent then relies upon the rule that "where the impossibility of performance is known to the promisor at the time of making his promise,

but not to the promisee, he must be taken to have intended to make himself absolutely liable." The rule does not apply in this case. Here the respondent was the *promisor* and he did not know that his promise was impossible of performance, that is, that he had no right to redeem the land. The promisee of this impossible promise was the appellant. We are not here concerned with the question of the respondent being absolutely liable for anything.

 The respondent contends that notwithstanding the fact that he had no right to redeem the property, his promise not to do so, reasonably interpreted in the light of the situation as it then existed and as it was then known to appellant although unknown to respondent, was in effect an agreement not to bid at the county sale of April 6, 1939. In other words, his promise not to redeem was the equivalent of a promise not to bid at the sale. Hence, the appellant received all the benefit it could have received in any event when it became the successful bidder and therefore should be bound to perform its promise thus given for a valuable consideration.

Even if the respondent's promise be considered as an agreement not to bid at the public sale of county lands, it would avail respondent nothing. Such agreements, which chill or suppress bidding, have long been held invalid and against public policy, subject only to the exception recognized in this court's opinion in *Spokane Savings & Loan Society v. Park Vista Imp. Co.,* 160 Wash. 12, 294 Pac. 1028, where such an agreement was sustained where made between parties desiring "to protect existing interests." In the case at bar, however, the county was the owner of the property. Neither appellant nor respondent had any "existing interest" in it. In consequence, the prohibition of the law, as expressed in the *Spokane Savings & Loan Society* case, *supra,* against chilling and suppressing bids at public sale

" ' . . . is clearly applicable to a case where a prospective bidder gives a consideration to another prospective bid-

der to induce the latter not to bid against the former. This is a species of bribery which cannot be tolerated.' 6 R. C. L., p. 810, § 210."

See, also, *Lindeman v. Duncan,* 136 Wash. 598, 241 Pac. 7.

However, the respondent did not agree not to bid at the public sale. He agreed not to redeem the property prior to the sale. There would be no point in transmuting the promise made into the promise contended for by some process of judicial alchemy only to find that the latter promise was void.

Finally, it is contended that, even though the respondent did not have the right to redeem the property, he believed that he had such a right in good faith, and the surrender of even a doubtful right is a sufficient forbearance to constitute consideration.

"Forbearance," as a consideration, is usually concerned with forbearance from litigation. In such cases, there is a broader "twilight zone" of doubtfulness, since, in the majority of such situations, the ultimate actual validity of claim forborne could only be determined by an adjudication of the case. Here, there was no forbearance from litigation, and there is no question of a compromise of existing rights. The right of an owner to redeem property from a tax sale prior to the issuance of a treasurer's deed to the county is created by statute. It does not exist after the issuance of the deed. The existence or nonexistence of such a right is not controversial in its nature. Indeed there was no hint of any controversy between the parties as to what the respondent's rights were in that connection and hence no compromise of it.

The contract was *nudum pactum.*

The judgment is reversed.

BEALS, MILLARD, STEINERT, and SIMPSON, JJ., concur.

---

May 2, 1946. Petition for rehearing denied.