IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 35833-0-III |
| R.M. | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — Following a 37-month dependency, R.M.'s father's parental

rights to his son were terminated.  The father appeals the termination order, arguing (1)

his right to due process was violated when the termination court adopted the dependency

court's findings as substantive evidence, (2) the termination court erred when it adopted

hearsay statements as substantive evidence, and (3) the Department of Social and Health

Services (Department) failed to meet its burden to prove three required elements.  We

find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

In February 2014, R.M., then approaching 5 years old, was removed from his

father's care by the Department.  The precipitating event was a report from staff of a

Salvation Army shelter, where the father and R.M. were living, that the father might be

physically mistreating R.M.

The Department was familiar with the father, having monitored his and R.M.'s situation for approximately six months. It had initiated an investigation in late January 2014, after receiving reports that the father was neglecting R.M. It concluded that the father and R.M. were "squatting" in the home of the father's recently-deceased father in unsanitary living conditions, with no running water, and that the father was selling appliances and fixtures from the home to buy drugs. Sealed Clerk's Papers (CP) at 231. It was at the Department's recommendation that the father and R.M. moved into the Salvation Army shelter.

The Department filed a dependency petition on the same day it removed R.M. from his father's care. At a shelter care hearing a week later, R.M. was placed with his mother, who was undergoing inpatient substance abuse treatment at Isabella House. At the same hearing, the father was required to provide random urinalyses (UAs) and obtain a parenting assessment and mental health assessment.

In July 2014, five months after the dependency petition was filed, dependency as to the father was established by default because he had not been in contact with the Department or his court-appointed attorney.

In December 2014, R.M. was removed from his mother's care and placed in foster care. The Department filed a petition to terminate both parents' rights in May 2015. While the father was found in default in February 2016, that default was later vacated. Following appointment of a new lawyer and several continuances, an amended petition

2

for termination of the father's parental rights was filed in May 2017. The matter proceeded to trial in August 2017. By the time of the father's termination trial, R.M.'s mother's parental rights had been terminated.

Termination trial

At the four-day termination trial, the Department called 17 witnesses: Kirsten Liesch, a Department social worker assigned to the father's case in July 2015, R.M.'s individual therapist, the guardian ad litem, 3 Department of Corrections employees familiar with the father's incarceration and community supervision during the dependency, 4 counselors or other individuals familiar with the father's chemical dependency treatment and urinalysis (UA) compliance, 3 mental health therapists who had provided individual therapy services to the father, 3 family therapists who had accepted referrals to provide services to the father and R.M., and a psychologist who had agreed to perform a psychological evaluation as a precondition to family therapy. The father testified at length in the defense case. Evidence presented included the following matters.

For the first 10 months after R.M. was removed from his care, the father largely ignored the dependency process. He failed to engage in services ordered at the shelter care hearing. He had almost no contact with the Department. In May 2014, the father contacted the Department to report he was receiving inpatient chemical dependency treatment and wanted to schedule visitation with R.M., but the Department was informed

3

about a month later that the father left inpatient treatment against the staff's

recommendations. After dependency as to the father was established by default in July,

the Department's next contact with the father was at the end of December 2014, when he

called in response to a social worker's voicemail. The social worker informed him that

R.M. had been removed from his mother's care and was in foster care.

The father acknowledged his lack of participation in the dependency process. He

told the social worker he had recently completed inpatient treatment, was receiving

intensive outpatient treatment, and was ready to do whatever was required to get his son

back. The father was then serving time on criminal convictions but had qualified and

opted to serve time in drug court. Because the father was participating in drug court

during calendar year 2015, it was possible to refer him for visitation and services.

The community custody officer (CCO) who supervised the father's participation in

drug court described him as "struggl[ing]" with the program during 2015. Sealed Report

of Proceedings (RP) at 275. About a month into drug court treatment, the father admitted

that he was missing UAs and treatment because he was using "Spice."[1] When the father

provided UAs (he often failed to appear for testing) he often tested negative; however,

the UAs did not test for Spice. He missed many treatment and court dates, including

times when his CCO believed he was in jail on municipal court charges. The father

---

[1] Spice is a synthetic marijuana.

4

committed and was sentenced for a number of crimes during the dependency.[2]  His

conviction for possession of a controlled substance caused him to be terminated from the

drug court program in December 2015.

The struggling with drug court participation in 2015 that the father's CCO

described was mirrored by the father's inconsistent participation in visitation and services

during that year.

The Department scheduled visitations beginning in January 2015.  After the father

missed half of the visits in January and was discharged by the agency for too many no-

shows, the Department made a new referral so that visitation could resume in February.

At the end of February, the father was again discharged from visitation after he

threatened staff at the visitation site.  In March, May, and September 2015, the father

---

[2] He was sentenced for the following crimes during the course of the dependency:

| Offense date | Sentence date | Offense |
|---|---|---|
| 11-5-2013 | 2-2-2016 | Residential burglary |
| 1-19-2014 | 6-24-2014 | First degree criminal trespass |
| 3-16-2014 | 2-2-2016 | Residential burglary and forgery |
| 3-21-2014 | 8-17-2015 | Reckless driving, hit and run of an attended vehicle |
| 4-14-2015 | 5-20-2015 | Third degree malicious mischief |
| 4-28-2015 | 5-20-2015 | Driving under the influence |
| 6-2-2015 | 10-1-2015 | Hit and run of an attended vehicle |
| 10-8-2015 | 2-12-2016 | Possession of a controlled substance |
| 10-8-2015 | 1-26-2016 | Driving with license suspended |

RP at 242-43.

received additional referrals for visitation. In calendar year 2015, the father was scheduled for supervised visitation on 26 days; he attended 15 of the appointments and cancelled or no-showed for 11.

In June 2015, a parenting assessment of the father was performed by Amanda Clemons, based on her three hour observation of the father's interaction with R.M. While the father greeted R.M. in a positive manner and worked hard to interact with his son, Ms. Clemons described the father as "struggl[ing] to follow his son's lead." RP at 144. She testified that during the assessment R.M. avoided his father and did not respond to, or engage with him. Instead, he sought out Ms. Clemons for help. Ms. Clemons concluded that the son's relationship with his father was "significantly damaged" and the son "presented an extremely insecure avoidance attachment." RP at 151-52.

The father's last nontherapeutic visitation with R.M. took place on October 5, 2015—close to two years before the termination trial. Visitation scheduled for two days later was cancelled when the father appeared highly intoxicated on arrival. The father failed to attend a visitation scheduled for October 12; it was later determined that he had been incarcerated. Ms. Liesch testified to the record of R.M.'s reaction to the visitation scheduled for October 12:

> The report stated that [R.M.] had been picked up for the visit, and during the drive, he told the driver he didn't want to go and told the driver that he had broken his knees so he couldn't go to the visit, which wasn't true. When they got to the facility, [R.M.] refused to get out of the car and asked to go home. So he was taken home.

RP at 296. R.M.'s growing emotional distress over visitation led to a court order that visitation would henceforth take place only in family therapy.

In mid-November 2015, the father was referred to Lacey Hurley for family therapy with R.M. During the initial intake interview, Ms. Hurley found the father to be resistant to the Department's process and he appeared unwilling to engage. At the next two sessions with Ms. Hurley, however, the father was able to interact with his son. Based on the three sessions of therapy that she conducted, Ms. Hurley had concerns about the father's mental health and his hostility toward service providers.

The father began court-ordered mental health treatment in 2015, attending his first mental health therapy session with therapist Steven Erickson in January 2015. Mr. Erickson developed a treatment plan to address what he testified was the father's depression, anxiety, and problems with impulse control. While the father made some progress with Mr. Erickson, his very inconsistent attendance (he was scheduled to meet with Mr. Erickson weekly, but attended only 12 sessions between January 2015 and January 2016) impeded his ability to address his mental health issues. Mr. Erickson testified that the father had "difficulty controlling his anxiety and his depression" and needed "to work more heavily in terms of cognitively restructuring his internal dialog because of his negative perception of himself." RP at 105.

The father's termination from drug court in December 2015 and resulting incarceration ended the father's family therapy with Ms. Hurley and his individual

therapy with Mr. Erickson. Mr. Erickson's prognosis for the father was guarded if he did not receive continued mental health support. His recommendation was that the father receive continued treatment.

The father was transferred to minimum security at the Airway Heights Corrections Center on April 6, 2016, where he remained through mid-August 2016, at which point he completed a five-day DOSA[3] treatment program and qualified for work release. When Spice was found in his room at his work release housing a couple of weeks later, however, he was returned to Airway Heights. He was returned to minimum security in mid-October, where he stayed through his release on December 11, 2016. In light of his incarceration, the father did not complete any Department-referred services during 2016.

R.M. was receiving individual therapy during 2016 from Carol Thomas, and she talked to R.M. about the fact that his father could not have visits because he was incarcerated. R.M.'s individual therapy had begun in early 2015, as a result of his bad behavior and assaultive conduct at school. Initially, R.M. focused on his mother and expressed concern about her well-being. When Ms. Thomas raised the suspended visitation with his father in 2016, R.M. told her he did not know his father very well. R.M. also told Ms. Thomas that visiting his mother and father made him feel "torn up all the time. They make me want to throw stuff." RP at 206.

---

[3] Drug offender sentencing alternative.

Following the father's release from Airway Heights, Ms. Liesch referred the father to Chelsea Corigliano to resume family therapy with R.M. The father's first appointment with Ms. Corigliano was on March 15, 2017. Ms. Corigliano testified that the father presented as hesitant to engage in therapy, stating that he and R.M. had a very stable relationship and that reports that he had mistreated R.M. were untrue. He told her that he and R.M. had experienced no trauma. This concerned her, because "[e]xtreme lack of insight into department involvement indicates either mental health issues, or . . . the inability to engage in repair with their child." RP at 185. Ms. Corigliano had a second and third session with the father but never included R.M., explaining that the father displayed hostile behavior and a lack of trust, which prevented them from establishing a therapeutic rapport. Upon terminating services to the father, Ms. Corigliano recommended that he receive a psychological evaluation and individual psychotherapy.

In March 2017, the father, having not yet obtained a required mental health assessment, traveled to the offices of Frontier Behavioral Health. Amy Klein, a Frontier employee, met with him to conduct an intake. She had no record of his history and relied on the father's self-report of his problems and needs. In testifying at trial, she referred to her records, which indicated that the father did not disclose to her his prior mental health treatment for depression, anxiety, and lack of impulse control. Lacking enough

9

information to arrive at even a tentative DSM[4] diagnosis, Ms. Klein diagnosed the father

with "illness unspecified." RP at 254. With that diagnosis, the father did not qualify for

any services at Frontier.

At trial, the father characterized Ms. Klein as having concluded that he "did not

need counseling." RP at 498. Ms. Liesch continued to tell the father that he needed to

have a full mental health assessment completed, but he refused. The father's lawyer

affirmed that the father would not return to a provider for a mental health assessment

based on the father's view that Ms. Klein concluded he did not need it.

Given Ms. Corigliano's termination of family therapy, Ms. Liesch referred the

father to a third family therapist, Heather Dazell. Ms. Liesch also contacted Carol

Thomas to let her know she was trying to set up family therapy between R.M. and his

father. Ms. Thomas broached this with R.M., who was by then 8 years old. She testified

at trial to his reaction:

> [R.M.] refused to go. He was very adamant about not wanting to go, saying
> he was scared of his father. He said, "I don't want to see him. I'm too
> scared." And he talked about phone calls that he had had with his father
> when he was incarcerated during visits with his paternal grandmother. And
> he said, "I didn't want to talk to him, but he called. I don't want to think
> about him. I don't like him. I don't want to talk about him. I don't want to
> see him."

RP at 207.

---

[4] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS.

The father had a single visit with Ms. Dazell, in which she describes him as vacillating between cooperation and hostility. He told Ms. Dazell that he had not seen R.M. in a year and a half and had only been able to speak with him on the phone. When Ms. Dazell told the father that R.M. reportedly did not want to see him, the father disagreed and said his and R.M.'s relationship was good. Ms. Dazell was concerned about the father's lack of insight into what was happening with R.M., but told him she would speak to Ms. Thomas about continuing family therapy with R.M. Ms. Dazell terminated family therapy with the father after learning from Ms. Thomas that R.M. did not want to participate. In lieu of resuming family therapy, Ms. Dazell recommended that the father receive a psychological evaluation and attend an Engaging Fatherhood class.

Ms. Liesch attempted to refer the father to other family therapy providers,[5] and in mid-July, Dr. Jameson Lontz agreed to consider family therapy but wanted to first complete a psychological evaluation to determine whether the father was a good candidate. The father arrived for his August 3 evaluation appointment an hour and a half late and refused to complete the intake paperwork. Dr. Lontz could see through his office window that the father was getting animated with the staff, so he stepped out and agreed

---

[5] Ms. Liesch testified at trial that during the course of the dependency, the Department referred the father to every contracted family therapy provider in Spokane County.

to speak with the father before he proceeded.  Asked about his concerns, the father questioned why he was being referred, accused the doctor of being against him, and "bec[ame] more physically agitated and loud." RP at 127.  Since there was no time left within which to complete the evaluation, Dr. Lontz encouraged the father to reschedule the psychological evaluation.  The rescheduled date was after the father's then-imminent termination trial.

R.M.'s guardian ad litem testified that when the father started to miss visitation, R.M. felt as though everyone was abandoning him.  She also testified that R.M. was afraid of his father, who had not taken the necessary steps "to show that he's going to consistently be able to help [R.M.] in the future." RP at 86.  She expressed her view that R.M. needed stability and she did not believe the father could prioritize his son's needs.

In the defense case, the father testified for a day and a half.  He told the court he had begun living at Oxford House, a clean and sober living facility, in late January or early February 2017.  By the time of the termination trial, he was the president of the house and helped facilitate the meetings and the urinalyses.  He testified that several months earlier, in April, he began working at his brother's automotive shop and that he planned to return to college the following month to complete the Toyota T-TEN program.  The CCO assigned to the father following his release from Airway Heights had testified in the State's case that the father provided consistently clean UAs following his release

12

and had undertaken a chemical dependency assessment that concluded he did not need further treatment.

The father had consistently denied ever physically abusing R.M. at the Salvation Army shelter and repeated his version of what led to the report by shelter staff that precipitated R.M.'s removal. According to the father, on the morning of the day R.M. was removed from his care, R.M. refused to brush his teeth, so the father took R.M.'s Nintendo videogame console, which was R.M.'s "favorite thing in the world." RP at 459. When R.M. "started screaming and freaking out" over the game console being taken, the father testified, "I accidently slammed it down on the counter too hard and broke the screen on it." RP at 459. The father testified that it was the breaking of the game console screen that caused R.M. to cry out, "[N]o!" and "throw[ ] a fit." RP at 459-60. He testified that he told the shelter staff—"two younger gals that are like 18 or 19 years old"—what had happened, and to "[c]alm down[,] I'm taking him to daycare," and "everything's fine." RP at 460. He noticed they still looked "really concerned." *Id.* That evening, police officers traveled to R.M.'s paternal grandmother's house, where R.M. was staying, and took him into Department custody.

The father testified that when he earlier obtained custody of R.M., it "was the best thing that ever happened," and when R.M. was taken away, he began heavily using drugs and alcohol. RP at 464. He told the court he took advantage of his incarceration to

13

complete an intensive drug and alcohol treatment program and engage in anger management and life management courses. He denied needing mental health counseling.

The trial court took the matter under advisement and later reconvened the parties to deliver an oral ruling. Explaining its decision to terminate the father's parental rights, the court stated that "most of [R.M.'s] life has been unsettled, unstable, and traumatic," his parents were only "episodically in his life," and they "were repeatedly inconsistent about making [R.M.'s] needs a priority." RP at 558-59. The court stated that the trial "demonstrated that [the father] was unable to comprehend how profoundly his . . . conduct and instability traumatized [R.M.]'s sense of self and life." *Id.* at 559. The court also commented on the father's enduring failure to obtain the mental health services he had been told he needed, by multiple providers.

Written findings of fact and conclusions of law were later entered. The father appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful of reasons.'" *In re Welfare of S.J.*,

162 Wn. App. 873, 880, 256 P.3d 470 (2011) (internal quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)). Washington statutes respond to this constitutional command by providing a two-step process before a court may terminate parental rights.

In the first step of the process, the State must prove six statutory elements provided by RCW 13.34.180. These elements "focus[ ] on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnote omitted). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). In addition to finding the six statutory elements, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated. *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995) (citing *Santosky*, 455 U.S. at 747-48). This finding need not be made explicitly and satisfying all six of the statutory elements raises an implied finding of parental unfitness. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

The second step is for the court to ascertain the best interests of the child. RCW 13.34.190(1)(b). "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

In this case, the father argues that the trial court violated his right to due process when it relied for its termination decision on factual findings made in the dependency proceeding, including factual allegations based on hearsay. He also argues that insufficient evidence supports the trial court's findings of the termination elements provided by RCW 13.34.180(1)(e) and (f), and that it erred in finding that termination was in the best interest of R.M., as required by RCW 13.34.190.[6]

We first address the father's challenges to the trial court's reliance on factual findings made in the dependency proceeding and then turn to the sufficiency of the evidence to support its termination decision.

I.     WHETHER THE TRIAL COURT ERRED IN ASSERTING THE BINDING CHARACTER OF FINDINGS IN THE DEPENDENCY PROCEEDING DEPENDS ON WHETHER THEY WERE RELEVANT AND SUPPORTIVE OF FINDINGS THAT THE FATHER CHALLENGES

The father's due process challenge is to one of the 44 findings of fact made by the trial court; specifically, the following language from finding 2:

> The father disputed the facts contained in the dependency petition at this trial, however, the dependency court adopted the allegations set forth in the petition as findings of fact. They are a verity, that cannot be disputed.

---

[6] Of the four elements that the father does not challenge, the first three are procedural and are seldom in dispute. RCW 13.34.180(1)(a)-(c). The sixth element, also unchallenged by the father, is, "That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d).

16

CP at 310. As the father correctly contends, the Department's burden of proof in a

dependency proceeding is a preponderance of the evidence, whereas its burden of

proving most matters in a termination trial is clear, cogent, and convincing evidence.

It is questionable whether facts contained in the dependency petition had much

relevance to the different issues presented at the termination trial. The issue for the

dependency court was whether, as of July 1, 2014, R.M. was abused or neglected by a

person legally responsible for his care and had no parent, guardian, or custodian capable

of adequately caring for him, presenting a danger of substantial damage to his

psychological or physical development. Ex. P-3 at 2 (findings, conclusions, and order,

concluding the State proved dependency under RCW 13.34.030(6)(b) and (c)). The

allegations of the dependency petition were of multiple reports of suspected neglect and

emotional abuse; there were no reports that R.M. was physically injured by his father.

The report by Salvation Army staff of a concern on February 28 was only one of the

reports recounted in the petition (and only one of the reported concerns of Salvation

Army staff recounted).

At issue in the termination trial were circumstances existing over three years later,

and what had happened in the intervening years was most consequential.

What the trial court might have intended by the challenged language in finding 2 is

that the dependency court's findings, conclusions, and order were dispositive on whether

there was a legitimate basis for finding R.M. dependent in July 2014 and subjecting the

17

father to the requirements of the dependency process. The father appears never to have accepted the legitimacy of the dependency proceeding. In that limited sense, the July 2014 order *was* a verity.

Whether the trial court went beyond that limited meaning and erroneously relied on the dependency court's findings to support its conclusion that the statutory requisites to termination were proved is a different issue. That is something to be assessed, and that we will assess, in connection with the father's challenges to the sufficiency of the evidence.

The father also contends that factual allegations in the dependency petition constituted hearsay, which the court erroneously relied on as substantive evidence. Under questioning by Department counsel, Ms. Liesch read factual allegations from the dependency petition at trial. The father did not object. She read from the petition in the context of explaining the type of background information on the father that she passed along to providers in making referrals. "Social workers may offer hearsay testimony to show how they arrived at their opinions." *In re Welfare of X.T.*, 174 Wn. App. 733, 738, 300 P.3d 824 (2013). But a social worker may not use an absent witness's written reports as substantive evidence. *Id.*; *In re Welfare of J.M.*, 130 Wn. App. 912, 924, 125 P.3d 245 (2005).

"RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them." *State v. Guzman Nunez*, 160 Wn.

18

App. 150, 157, 248 P.3d 103 (2011), *aff'd in part, rev'd in part*, 174 Wn.2d 707, 285

P.3d 21 (2012) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). To the

extent the assignment of error relates to Ms. Liesch's testimony, it was unpreserved and

we decline to address it.[7]

II.     SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDINGS, AND THE
        FINDINGS SUPPORT THE TRIAL COURT'S CONCLUSION, THAT THE ELEMENTS
        REQUIRED BY RCW 13.34.180(1)(e) AND (f) WERE PROVED

In reviewing a trial court's decision to terminate parental rights, we will uphold its

factual findings "if supported by substantial evidence from which a rational trier of fact

could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137

Wn.2d at 925. "Because of the highly fact-specific nature of termination proceedings,

deference to the trial court is 'particularly important.'" *K.M.M.*, 186 Wn.2d at 477

(quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to

the trial court's determinations of witness credibility and the persuasiveness of the

evidence. *Id.* We review de novo whether the trial court's findings of fact support its

conclusions of law. *Id.*

---

[7] In a footnote, the father argues that if a challenge to hearsay was waived, then the failure to object amounted to ineffective assistance of counsel. Sealed Br. of Appellant at 13 n.5. But the father did not assign error to ineffective assistance of counsel and fails to present argument on the essential demonstrations of deficient representation and prejudice. We will not review the suggestion that counsel was ineffective. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243-44, 237 P.3d 944 (2010); RAP 10.3(g).

      A.     Sufficient evidence supports the court's finding that there is little likelihood that conditions will be remedied in the near future (RCW 13.34.180(1)(e))

RCW 13.34.180(1)(e) requires a demonstration "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005). Ms. Liesch testified at the termination trial that the near future for R.M. was "now." RP at 353.

RCW 13.34.180(1)(e) provides that if the State makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided and the parent has failed to substantially improve his parental deficiencies within 12 months following entry of the dispositional order, then a rebuttable presumption arises that there is little likelihood that return of the child in the near future will be possible. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). "A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the [Department] has satisfied RCW 13.34.180(1)(e)." *Id.*

In connection with this assignment of error, the father assigns error to the trial court's supporting factual findings 32, 33, and 34. Among those findings were that the rebuttable presumption applies and was not overcome by the father. The court found that

"[the father]'s issues have persisted for the last three and one half years" and "[h]e has had several years to embrace what the Department and professionals have attempted to make available, and he flatly refused essential steps." CP at 321. It also found that it could consider the father's failure to have contact with R.M. for an extended period of time.

The father complains that the trial court did not make a finding as to what amount of time constitutes the near future for R.M. The trial court made the ultimate finding that there was little likelihood that conditions would be remedied in the near future, which is supported by Ms. Liesch's testimony. The father cites no legal authority requiring the trial court to place an explicit time frame on what constitutes the near future.

The father does not dispute that the Department clearly offered all necessary services. But he argues that because he successfully completed drug treatment, "the only remaining barrier to reunification was for the father and son to repair their bond." Sealed Br. of Appellant at 18. There was substantial evidence that this "only remaining barrier" was a massive if not insurmountable one. Ms. Thomas's testimony established that the bond between the father and R.M. had never been strong. Ms. Clemons's testimony established that by as early as June 2015, the relationship was significantly damaged. The evidence established that the father's indifference, unreliability, destructive conduct and substantial unavailability for over three years had unsurprisingly destroyed *any* bond, and that by the time of trial R.M. affirmatively objected to seeing his father. Three

21

family therapists testified that the father's unwillingness to engage, his hostility, and his failure to recognize the effect on R.M. on his years' worth of poor choices and displaced priorities would interfere with or prevent meaningful therapy. If the father did not change his attitude—and there was no sign that he would—there was no apparent path to a father-son bond.

If relevant at all, the factual findings adopted by the dependency court that were deemed "a verity" in finding 2 are inconsequential with respect to this issue. The finding that RCW 13.34.180(1)(e) had been proved was supported by clear, cogent and convincing evidence.

> B.     Sufficient evidence supports the trial court's finding that continuation of the relationship diminishes R.M.'s prospect for early integration into another home (RCW 13.34.180(1)(f))

RCW 13.34.180(1)(f) requires a demonstration that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." In connection with this assignment of error, the father assigns error to the trial court's supporting factual findings 36 and 39. Finding 36 states that continuation of the legal relationship of parent and child will result in R.M. remaining in limbo. Finding 39 addresses the negative impact on R.M. on the continued legal relationship, stating in part:

> [R.M.] feels rejected and that he isn't loved. Trauma isn't caused just by physical abuse alone, but by inconsistency in contact and caregiving availability. Children in play therapy process trauma towards positive

22

> resolution. [R.M.] suffers from self-blame: he feels it is his fault his parents do not visit him. He is learning health coping skills, but as long as he feels threatened he cannot use these learned skills. The constant re-traumatization by re-introducing his father into his life clearly diminishes his early integration into a stable and permanent home.

CP at 323-24.

The father argues that because R.M. had significant behavioral issues while in foster care, did not have a prospective adoptive placement, and might not be adoptable without government support for his needed therapies, reunification is R.M.'s best option.

To prove the termination factor, the State does not have to show that a stable and permanent home is available. *In re Dependency of K.D.S.*, 176 Wn.2d 644, 658, 294 P.3d 695 (2013). Where there is no prospect for a child being adopted, other evidence regarding the quality of the parent-child relationship has been found to satisfy the State's burden of proving RCW 13.34.180(1)(f). *Id.* The factor can be proved by demonstrating that "continuation of the parent-child relationship create[s] feelings of insecurity and instability in the child" or stated differently, is "destabiliz[ing]" for the child. *Id.* at 658-59.

Ms. Thomas's testimony is substantial evidence that clearly, cogently and convincingly supports the trial court's finding that RCW 34.14.180(1)(f) was proved. Again, if relevant at all, the factual findings adopted by the dependency court that were deemed "a verity" in finding 2 are inconsequential with respect to this issue.

III. SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDINGS, AND THE FINDINGS SUPPORT ITS CONCLUSION, THAT TERMINATION WAS IN R.M.'S BEST INTEREST

If a trial court concludes that the State has established the factors of RCW 13.34.180(1) by clear, cogent, and convincing evidence, it must then consider, as the second step in the process, whether terminating parental rights is in the best interest of a child. That termination is in the child's best interest must be established by a preponderance of the evidence. RCW 13.34.190; *A.B.*, 168 Wn.2d at 911.

In connection with this assignment of error, the father assigns error to the trial court's supporting factual finding 41. The trial court observed in that finding that the guardian ad litem, Ms. Thomas, and Ms. Liesch had all expressed the opinion that terminating the parent-child relationship was in R.M.'s best interest. The trial court added that R.M. "has been in limbo for over 42 months." CP at 324.

Whether termination of parental rights is in the best interest of the child is a fact-specific inquiry. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alterations in original) (quoting *In re A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

24

No. 35833-0-III
*In re Parental Rights to R.M.*

Here again, if relevant at all, the factual findings adopted by the dependency court that were deemed "a verity" in finding 2 are inconsequential to this issue. The 42 month limbo, along with the opinions of R.M.'s individual therapist, the social worker, and the guardian ad litem provide clear, cogent and convincing evidence supporting the trial court's "best interest" finding.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Pennell, A.C.J.

25